292 F.Supp. 580 (1968)
James ROLLINS, Henry Thomas, Jose Renteria, Walter Quarles, Fred Krump, James Smith, Solomon Rooks, Chairman of the St. Louis Committee of Racial Equality and St. Louis Committee of Racial Equality, Plaintiffs,
v.
Thomas W. SHANNON, Defendant.
No. 67 C 358(2).
United States District Court E. D. Missouri, E. D.
September 26, 1968.
*581 *582 Charles Oldham, Bruce Nangle, Louis Gilden, Samuel Liberman, II, St. Louis, Mo., Joseph Cohn, East St. Louis, Ill., for plaintiffs.
*583 Thomas W. Shannon, Pros. Atty., City of St. Louis, St. Louis, Mo., for defendant.
Before MATTHES, Circuit Judge, and HARPER and MEREDITH, District Judges.
PER CURIAM.
The original complaint in this action was filed on October 16, 1967. It alleged certain arrests, threatened and actual prosecutions for the alleged violation of certain ordinances of the City of St. Louis, Missouri, and of section 562.150, R.S.Mo.1959, V.A.M.S., which occurred during and after a "rally" held in the Pruitt-Igoe Housing Project on August 23, 1967. Plaintiffs sought a temporary and permanent injunction to prevent their prosecution under the ordinances and statute in question, and further sought to have this Court declare the same unconstitutional.
The original plaintiffs were: (1) James Rollins, a Negro-American and a member of the St. Louis Committee of Racial Equality (hereinafter referred to as CORE); (2) Henry Thomas, a Negro-American and then Vice-Chairman of CORE; (3) Jose Renteria, a Negro-American and a member of CORE; (4) James Smith, a Negro-American; (5) Walter Quarles, a Negro-American and member of CORE; (6) Fred Krump, a Negro-American and a member of CORE; (7) St. Louis CORE and its chairman, Lucien Richards.
Mr. Rollins was charged with violating section 762.030, Public disturbance of the peace; section 761.020, Damaging certain properties; section 756.020, Contributing to delinquency of a child; and section 763.010, Prohibition (unlawful assembly), (all being alleged violations of the Revised Ordinances of the City of St. Louis). He was further charged under section 562.150, R.S.Mo.1959, Unlawful Assembly. Mr. Thomas was charged with the same violations as was Mr. Rollins. Mr. Renteria was similarly charged. Mr. Smith was not a member of CORE. He was charged as was Mr. Rollins. Mr. Quarles was not charged under section 763.010 of the Revised Ordinance, nor under section 562.150, R.S. Mo.1959. Mr. Krump was charged under all of the noted ordinances, but was not charged under the state statute.
St. Louis CORE has as its stated purpose to help to secure to all Negro-Americans the rights guaranteed to them by our Constitution, to end racial discrimination, to teach all citizens Negro-American heritage, and to inform all citizens of the grievances and complaints which Negro-Americans have against those who discriminate on the basis of race. In the furtherance of these aims, CORE, by its members, utilizes protest activities of various sorts.
Each of the named plaintiffs, excepting only James Smith, in addition to suing in his own behalf also sues in behalf of "all members of St. Louis CORE and all Negro American citizens of the City of St. Louis, Missouri, similarly situated, which classes are too numerous to bring before the Court."
The original defendants were: Alphonse J. Cervantes, Mayor of the City of St. Louis; Curtis Brostron, Chief of Police; Thomas Shannon, Prosecuting Attorney for the City of St. Louis (the City of St. Louis is both a city and a county, therefore, Mr. Shannon is a state official who has the responsibility for prosecuting misdemeanors under the laws of the State of Missouri); Thomas McGuire, City Counselor for the City of St. Louis; and eight named officers of the St. Louis Police Department.
Jurisdiction was invoked under Title 28, U.S.C., sections 1331, 1332, 1343(3) and (4), 2201, 2202, 2281 and 2284; Title 42, U.S.C., sections 1971, 1981, 1983, and 1985; and the Constitution of the United States, the First, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, Thirteenth, Fourteenth, and Fifteenth Amendments thereof.
Plaintiffs' complaint alleged that under the color of state law the defendants have entered into a "plan or scheme of concerted and joint action", the purpose *584 of which is to deprive plaintiffs of their constitutional rights; that under this plan they have attempted to, and threaten to, prosecute plaintiffs under the noted laws; that a double standard of law enforcement and prosecution exists, employed more harshly against Negro-Americans; that plaintiffs were arrested after the rally of August 23, 1967; that those arrests were made for the sole purpose of silencing speech and assembly; and that the laws in question are unconstitutional.
Simultaneously with their complaint, plaintiffs requested a Three-Judge District Court. Since a state statute was challenged, and since the allegations of bad faith were sufficient to raise substantial constitutional questions, the Honorable Charles J. Vogel, Chief Judge for the Eighth Circuit, pursuant to 28 U.S.C., section 2281, designated this Three-Judge Court to hear plaintiffs' suit. See Moody v. Flowers, 387 U.S. 97, 101, 87 S.Ct. 1544, 18 L.Ed. 2d 643 (1967).
On November 13, 1967, all of the city officials answered and moved to dismiss. Defendant Shannon answered separately and moved to dismiss for lack of jurisdiction. Pursuant to 28 U.S.C. § 2284 (2), this action was found to involve the enforcement of a state statute, and on December 12, 1967, it was ordered that the required notice be given to the Governor and Attorney General of the State of Missouri. On December 20, 1967, the State of Missouri by its Attorney General entered its appearance. Defendants' motions were overruled by this Court following oral arguments.
On February 20, 1968, plaintiffs requested and were granted leave to file their First Amended Complaint. One Solomon Rooks was substituted for Lucien Richards as Chairman of CORE, and Eugene Freeman was substituted as defendant for Thomas McGuire, who had resigned the position of City Counselor. This amended complaint is, in essence, the same as the original. It alleges the same plan or scheme, etc. It challenges section 562.150, R.S.Mo.1959, as being void on its face and/or as applied on the basis that it violates the First Amendment, that it is void for over-breadth, and that it is void for vagueness. In addition, it alleges that the defendants, pursuant to the plan or scheme alleged, arrested the plaintiffs in the absence of any clear and present danger in order to suppress plaintiffs' right to freedom of speech and peaceable assembly. In addition, plaintiffs expanded their allegations that the prosecutions and threatened prosecutions have a "chilling" effect on the First Amendment rights of those who would seek to express the grievances of the Negro-Americans in St. Louis, by means of the exercise of their First Amendment rights. At the same time, defendant Shannon filed a motion for summary judgment, which motion was overruled on March 5, 1968.
A third pre-trial conference was held on March 7, 1968. Eight days later, plaintiffs dismissed their action without prejudice as to all of the named city officials, leaving only Thomas Shannon as a party-defendant. Such dismissal leaves only section 562.150, R.S.Mo.1959, under attack. The fifth pre-trial conference was held on April 11, 1968. At that time it was agreed and ordered that the cause would be submitted solely on depositions and exhibits. Both parties were requested to file suggested findings of fact and conclusions of law, which they have done.
On May 16, 1968, attorneys for the plaintiffs, pursuant to 42 U.S.C., section 2000a-3(b), filed their motion and affidavit for attorneys' fees. The Court held this motion in abeyance pending its final decision.
On July 11, 1968, defendant Shannon by means of a new motion to dismiss the action, informed the Court that plaintiffs Rollins, Renteria, and Smith had withdrawn their pleas of not guilty to the state charge under section 562.150 and had entered their pleas of guilty as charged. These pleas of guilty occurred *585 on July 10, 1968, after the trial on the charge was into its second day and a jury had been sworn and some evidence adduced. The State of Missouri entered a nolle prosequi as to plaintiff Henry Thomas. Except for Mr. Rollins, all of the plaintiffs who were charged with violations of the various city ordinances have pleaded guilty to the violation of section 762.030, Public disturbance of the peace, and the other charges were dismissed by the City.
Therefore, this Court has before it for decision (1) plaintiffs' motion for attorney fees pursuant to 42 U.S.C. § 2000a, and (2) defendant Shannon's motion to dismiss. In the event the latter motion is overruled, this entire cause is ready for decision. For reasons that will be later given, defendant Shannon's motion is sustained in part and overruled in part, and this Court feels that it must reach a decision on the merits of this cause.
Without undertaking to fully summarize the pleadings, plaintiffs' attack here is now directed solely to section 562.150, R.S.Mo.1959. The attack is based upon allegations of a scheme or plan to deprive plaintiffs of their constitutional rights, and discriminatory, bad-faith, enforcement of the law involved; an allegation that said statute violates the First Amendment; and an allegation that said statute is void for vagueness and over-breadth. Defendant Shannon's answer denies the allegations which constitute plaintiffs' cause; asserts that the law is constitutionally valid; and urges this Court to abstain.

Findings of Fact and Conclusions of Law
The summer of 1967 was one of this country's truly "long hot summers". Outbreaks of violence and riots occurred in Atlanta, Georgia, in April; on June 11th in Tampa, Florida; on June 12th in Cincinnati, Ohio; on June 17th again in Atlanta, Georgia; on June 20th in Newark, New Jersey; and on July 22nd in Detroit, Michigan. These outbreaks on the whole must be termed riots, the participants for the most part being Negro-Americans. See Report of the National Advisory Commission on Civil Disorders. It is against the background of these events and the racial tension then existing that the occurrences which led to the arrest and prosecution of the plaintiffs took place. St. Louis, Missouri, had fortunately escaped the violence that had racked other large American cities. However, the city was tense.
On August 19, 1967, Leroy Tungstall, a Negro-American, was shot and killed by an officer of the St. Louis Police Force during the commission of a robbery. This heightened the pre-existing racial tension. On August 20th, at the regular Sunday meeting of St. Louis CORE, it was decided to hold a series of rallies to protest this shooting and other alleged injustices. Plaintiffs Rollins and Thomas were involved in the organization of the rallies. Mr. Thomas procured a microphone from Mr. Renteria and had it repaired. This mike and a sound system were the property of CORE, and were utilized during the rallies on August 22nd and 23rd. On August 21st, Mr. Thomas in the presence of Mr. Renteria, prepared two handbills for distribution. The handbills now marked defendant's Exhibits 1 and 2 were distributed throughout the city. (See App. A.) The evidence indicates that these two handbills were distributed prior to the rally held on August 22nd. Although additional handbills were prepared for the rally on August 23rd, there is no evidence that they were distributed prior to that rally. These two handbills, Exhibits 1 and 2, are, to say the least, inflammatory. They are indicative of the mood of the plaintiffs at that time.
Following the plan established on August 20th, a rally was organized and held on August 22, 1967. No violence resulted from this rally. After various people spoke, including some or all of the plaintiffs (Smith states that he did not attend the rally of the 22nd, and Sgt. Wren is not sure whether he saw Smith there), the plaintiffs urged the group to march to the offices of the Human Development *586 Corporation (HDC). Mr. Renteria testified that this march was designed to burn off the energy of the crowd. The group began to disperse at HDC, whereupon Mr. Richards, and then Mr. Rollins, announced that another rally would be held on August 23rd. There is no evidence that any arrests occurred as a result of the rally on the 22nd, while it is clear that there were police present at the rally and in the vicinity thereof.
The next evening, the second rally was held, as announced, at 2210 Cass (in the Pruitt-Igoe Housing Project) to protest alleged police brutality and other injustices. Between 7:00 and 7:45 p. m., Mr. Renteria arrived and set up the public address system and began to play music to attract a crowd. A small group gathered at first, but grew so that it eventually numbered in the neighborhood of two hundred, of which the largest portion was juveniles. Police were stationed in the vicinity of the rally and two Negro officers were present on the scene, Sgt. Wren and Patrolman Jones. They were stationed about fifteen feet from the speakers. These officers characterized the speeches of Mr. Renteria, Mr. Rollins, and Mr. Smith as profane and inflammatory. Clearly, these plaintiffs did speak out and protest against racial discrimination and police brutality. It is also clear that they went much further than that. Mr. Rollins stated: "We are tired of white honky cops killing our people. It's time for us to break in gun stores, not grocery stores * * *" Mr. Renteria stated, in essence, that if people thought the riots in Newark and Detroit were something, they were really going to see something in St. Louis. Mr. Smith's words were in the same vein. This Court rejects plaintiffs' attorneys' contention that this speech amounts to nothing more than "kill the umpire type language". The evidence clearly indicates that the plaintiffs Rollins, Smith, and Renteria far exceeded the permissible bounds of free speech by urging the crowd to violence against the officers of the law and the white community. See, e. g., Mr. Justice Holmes in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919); Fox v. State of Washington, 236 U.S. 273, 35 S.Ct. 383, 59 L.Ed. 573 (1915); Chaplinsky v. State of New Hampshire, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); Feiner v. People of State of New York, 340 U.S. 315, 71 S.Ct. 303, 95 L.Ed. 267 (1951); and Cox v. State of Louisiana, 379 U.S. 559, 563, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).
The crowd moved to Jefferson and Dayton (Division) at the behest of some of the plaintiffs who felt that they could attract a larger number at this site (the proximate location of the Tungstall shooting). Plaintiff Renteria spoke again. A priest, Father Shocklee, now appeared at the scene of the rally. He had come at the request of one of his parishioners, who wished the Father to find her son and remove him from the crowd. Officer Jones, a Negro policeman in attendance, states that Mr. Renteria urged the crowd to "kill the white honky over there", referring to Father Shocklee. Others state that these words came from the crowd. A number of the crowd rushed at the Father, some of them holding sticks and bottles. Sgt. Wren and Officer Jones stood by the Father and with the aid of Norman Seay, violence was averted. Two white police officers were on the scene at this time, but were advised by Sgt. Wren to remain in their car. Officer Doyle returned to his car and on doing so heard a couple of thumps on the side of the car.
Lt. Beckman, an officer with twenty-six years experience, testified that this "mob" was the worst that he had ever seen. It was his opinion at the time, that the City of St. Louis was going to be sacked. The crowd, now a mob, began to move. Windows in the area were reported being broken and police cars damaged. Mr. Renteria was seen in front of part of the crowd and appeared to be leading it. He was then arrested as being the "Ace" man in the hope of dispersing this part of the crowd. It did *587 disperse. At various times thereafter, after being seen with, talking to, and leading or directing parts of the mob, plaintiffs Thomas, Krump, Quarles, and Smith were arrested. Plaintiff Rollins was arrested at the police station after a conversation with Lt. Beckman. It is the opinion of this Court that the prompt and non-provocative action of the St. Louis Police Department, during and after the "rally", served in large part to prevent the violence from spreading and becoming a true riot. As it was, the violence was limited to damage to police cars and to windows in stores and offices in the area.
This Court specifically finds that there is no evidence which supports a "plan or scheme" to deprive any of the plaintiffs of their constitutional rights. The Court notes that each of the plaintiffs had attended many rallies without arrest or harassment. Plaintiffs' allegation that the police request for a group picture is a manifestation of this plan is rejected. Rather, such pictures are found to be standard police practice. Further, this Court finds that the plaintiffs have produced no evidence from which this Court could find that a double standard of law enforcement exists in the City of St. Louis or in the office of Mr. Shannon.
This Court further specifically finds that the arrests of the plaintiffs were not made for the purpose of silencing speech and assembly, but, rather, were made only after the violence of the night of August 23rd had begun, and were made to prevent the further spread of that violence and after probable cause for arrest had arisen.
The arrests and prosecutions of the plaintiffs under section 562.150, R.S.Mo. 1959, are found to be in good faith and not motivated by any attempt to stifle the precious freedoms guaranteed by the First Amendment. The Court fails to find sufficient evidence to support allegations of harassment and intimidation. That the plaintiffs charged under this statute, altered the pleas to guilty after the presentation of evidence, is the strongest possible indication that the prosecutions of plaintiffs were in good faith and with clear hope of conviction. It is clear to this Court that these prosecutions were a good faith attempt by the prosecution to uphold the statutory laws of Missouri and not to stifle or harass plaintiffs. It was not a cover-up for illegal arrest, but a valid prosecution for a violation of the laws of Missouri.
The initial legal problem which the Court will consider is the question, raised by Mr. Shannon's motion to dismiss, of whether this action can now be maintained as a class action. Plaintiffs, except for Smith, sue in behalf of themselves, and of "all members of St. Louis CORE and all Negro American citizens of the City of St. Louis, Missouri, similarly situated, * * *" In addition, under Rule 17, CORE itself is named a plaintiff.
In order to maintain a class action under Rule 23, it is necessary, in situations such as this, that there be common questions of law or fact among the members of the class which plaintiffs seek to represent. Here plaintiffs contend that the common questions presented are derived from the alleged scheme or plan to deprive Negro-Americans and members of CORE of their constitutional rights by means of discriminatory law enforcement, illegal arrest, bad-faith criminal prosecution, prosecutions under criminal statutes and ordinances which are constitutionally invalid, etc., such actions themselves and together, resulting in the deprivation of the constitutional rights, particularly the First Amendment rights, of the members of this "class". As already noted, this Court is of the opinion that the evidence fails to support these allegations. Plaintiffs have dismissed their action as to the police officers and city officials. (The Court notes that in so doing, the plaintiffs themselves failed to treat this action as a class action within Rule 23). This dismissal eliminated the ordinance *588 prosecutions from consideration. Thus, only the plaintiffs Rollins, Thomas, Renteria, and Smith are parties who have been prosecuted or threatened with prosecution under section 562.150. With the exception of these four, there is no evidence of pending, threatened, or imminent prosecution under this statute against any member of CORE, or any other Negro-American "similarly situated", arising out of the near-riot of August 23, 1967. Indeed, with this exception, there is no evidence that any others were prosecuted or threatened under this statute immediately after that occurrence.
The sole remaining questions, therefore, deal with the vagueness and over-breadth of this statute, and its validity under the First Amendment and an allegation that it is unconstitutional as applied to these plaintiffs. These questions are common only to the above-named plaintiffs and to no other member of the alleged class. We hold, therefore, that the proof fails to establish the prerequisites of Rule 23, and this action can no longer be maintained as a class action.
This being the case, the other named plaintiffs are found to be without standing to challenge the statute in question here, or to maintain or join in the action. There is no evidence that any of the other plaintiffs, Krump, Quarles, or Rooks, were arrested or threatened with arrest and prosecution under this statute. This Court can invoke its power to declare a statute unconstitutional only where the plaintiffs are "able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement * * *" Frothingham v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). See also Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), which distinguishes Frothingham as it relates to a taxpayer's standing while supporting the general concepts relating to the standing doctrine announced therein. It is a basic principle of constitutional law that one whose rights are not adversely affected by the operation of a statute or whose rights are not about to be adversely affected, lacks standing to challenge that statute. Alabama State Federation of Labor, etc. v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); Frothingham v. Mellon, supra; United States v. Lauer, 287 F.2d 633 (7th Cir. 1961). An individual may not, as a general rule, vicariously assert the constitutional rights of another. Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953). There are, of course, exceptions to this rule, particularly where no other means for the assertion of those rights is possible or practical, however, none of the exceptions allowed are relevant to this situation where those affected are named plaintiffs. Therefore, this Court will order this action dismissed as to plaintiffs Rooks, Krump, Quarles, and CORE.
Defendant Shannon, by his answer and in his motions, urges the Court to follow the judicial doctrine of abstention in this case. In our opinion, Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965), and Zwickler v. Koota, 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), prevent us from so doing. As noted in Zwickler, supra, the doctrine of abstention is designed primarily as an additional means of accommodating the complicated relationship of the federal and state court systems. Federal Courts must stand as the final authority on questions involving the Federal Constitution. England v. Louisiana State Board of Medical Examiners, 375 U.S. 411, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964); Martin v. Hunter's Lessee, 1 Wheat. 304, 14 U.S. 304, 4 L.Ed. 97 (1816). Abstention was designed as a counterpart theory to allow the state court system the chance to first decide vital issues of state law, to construe statutes, etc., and thereby perhaps *589 to avoid raising and deciding difficult constitutional questions. However, this doctrine so created to minimize friction has been severely limited, if not abrogated, by Zwickler and Dombrowski when the issues raised come within the purview of the First Amendment. Abstention is said to be improper "where * * statutes are justifiably attacked on their face as abridging free expression, or as applied for the purpose of discouraging protected activities." Dombrowski at 380 U.S. 489-490, 85 S.Ct. 1122. While Dombrowski seemed to state an exception where a single case would in the state court system resolve all issues, Mr. Justice Brennan states in Zwickler, 389 U.S. at 252, 88 S.Ct. at 397:
"In such case [referring to attacks upon statutes on their face for repugnancy to the First Amendment] to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect."
Perhaps, if plaintiffs' attack were limited to "vagueness", we could abstain. Here, however, we are faced with the additional contention of over-breadth. Under this situation, we feel compelled by the decision in Zwickler (pp. 249-250, 88 S.Ct. 391) to refuse to abstain. We, therefore, proceed to consider the case on the merits of the constitutional challenge.
Plaintiffs' contentions raise four issues: that the statute is repugnant to the First Amendment as it is applied to the states by the Fourteenth Amendment, see Gitlow v. People of State of New York, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138 (1925); Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); and De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278 (1937); that the statute is void for vagueness; that the statute is void for over-breadth; and that it is unconstitutional as applied to the plaintiffs.
Section 562.150, R.S.Mo.1959, Unlawful Assembly, provides:
"If three or more persons shall assemble together with the intent, or being assembled shall agree mutually to assist one another, to do any unlawful act, with force or violence, against the person or property of another, or against the peace or to the terror of the people, such persons so assembling, and each of them, shall be deemed guilty of an unlawful assembly, and on conviction thereof shall be punished as for a misdemeanor."
This statute is basically a codification of the common law offense of unlawful assembly with some variations. Historically, it was a lesser included offense in the riot laws, but modern statutes have differentiated the crimes. See generally, 91 C.J.S. Unlawful Assembly § 1, p. 495; 46 Am.Jur. 127; 4 Blackstone's Commentaries 146; and Heard v. Rizzo, 281 F.Supp. 720, 739 (E.D.Pa.1968). These statutes have as their purpose "* * * nipping in the bud, as it were, of incipient conspiracies, embryonic tumults, and plottings against the public peace * *." State v. Woolman, 84 Utah 23, 33 P.2d 640, 93 A.L.R. 723 (1934), and generally, Lair v. State, 316 P.2d 225, 71 A.L.R.2d 856 (Okl.Cr.App.1957), et seq. The Report of the National Advisory Commission on Civil Disorders recognizes that these types of statutes can be utilized to effect the prevention of riots in the modern times.
A statute is void for vagueness when it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Zwickler v. Koota, supra, 389 U.S. at 249, 88 S.Ct. at 396, quoting with approval, Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). This case, in addition to setting forth the above test, also states that the test will be satisfied where there are well-settled common law meanings for the words employed. See also Heard v. Rizzo, supra, *590 and United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963). A statute is void for over-breadth when it offends the constitutional principle that "a governmental purpose to control or prevent activities constitutionally subject to state regulation may not be achieved by means which sweep unnecessarily broadly and thereby invade the area of protected freedoms." Zwickler v. Koota, supra, 389 U.S. at 250, 88 S.Ct. at 396. See also NAACP v. Alabama, 377 U.S. 288, 307, 84 S.Ct. 1302, 12 L.Ed.2d 325 (1964). It is also clear that laws leaving too much discretion to the enforcing officer will be invalidated where such laws may be used to prohibit the exercise of First Amendment rights. Ashton v. Kentucky, 384 U.S. 195, 86 S.Ct. 1407, 16 L.Ed.2d 469 (1966); Shuttlesworth v. City of Birmingham, 382 U.S. 87, 86 S.Ct. 211, 15 L.Ed.2d 176 (1965); and Cox v. State of Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965). It is against this basic background of constitutional principles that this statute must be weighed, giving due regard to the special protection to which First Amendment rights must be accorded. See Dombrowski v. Pfister, supra; NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); Cox v. State of Louisiana, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); Freedman v. State of Maryland, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed. 2d 649 (1965).
Since we are without the benefit of a construction of this statute by the Missouri Supreme Court, we must construe it ourselves, giving the words therein their normal and reasonable meanings, and giving also due regard to the law of the State of Missouri in regard to the construction of penal statutes. Under the well-settled law of Missouri, statutes in derogation of the common law are to be strictly construed. Mack Motor Truck Corp. v. Wolfe, 303 S.W.2d 697 (St.L.App.1957); Taff v. Tallman, 277 Mo. 157, 209 S.W. 868 (1919). In addition, penal statutes are to be strictly construed against the state and in favor of the defendant. State v. Chadeayne, 323 S.W.2d 680 (Mo.1959); Borden Co. v. Thomason, 353 S.W.2d 735 (Mo.1962); and United States v. Young, 210 F.Supp. 640 (W.D.Mo.1962). In Ex parte Coder, 226 Mo.App. 479, 44 S.W. 2d 179 (K.C.App.1931), these rules of construction were applied to an information under this statute. That case held that it is necessary that the state affirmatively show that the person charged had the intent in fact to commit the unlawful act or in fact subsequently mutually agreed to assist in the commission of that act. Therefore, it is clear that mere presence at an unlawful assembly does not render one liable to arrest and prosecution under this statute. One must intend to and in fact participate.
Plaintiffs' attack on this statute, centers on three key phrases: "any unlawful act", "against the peace", and "to the terror of the people". They rely heavily on the recent decision of Landry v. Daley, 280 F.Supp. 938, N.D. Ill., March 1, 1968, wherein a portion of the "Illinois Mob Action" statute containing the first phrase was stricken. In that case the court felt constrained to hold that the phrase, "any unlawful act", was not limited to criminal acts. Reading this statute as a whole, and utilizing the salutory rules of construction employed by the Missouri Supreme Court and by this Court, the phrase must be taken as meaning any act which is prohibited by the criminal law. We do not feel that it can be reasonably said to comprehend the inclusion of acts which are only violations of the civil law. Therefore, this phrase does not render the statute unconstitutionally vague. Nor is it void for over-breadth. Since we must presume that all of the criminal law not here attacked is constitutional, this phrase cannot be, therefore, utilized to invade the protected area of the First Amendment rights. Clearly, presuming the constitutionality of the criminal law, the State of Missouri has a right, consistent with the Constitution, *591 to prohibit the violation of its criminal law. These prohibited acts are not, however, co-extensive with the criminal law. They must be done with "force or violence". These words are not unconstitutionally vague. Clearly, they convey the idea of the exertion of power against the will or consent of another. Just as clearly, the state may prohibit the use of force or violence in the commission of a criminal act. The statute continues to limit the area of the prohibited acts. The unlawful act, intended to be done with force or violence, must be one which is against the person or property of another. Plaintiffs do not attack this phrase. Or, the act must be one "against the peace or to the terror of the people". This is the area in which plaintiffs' attack is centered. Although the phrase "against the peace" resembles breach-of-peace statutes, it is not so vague or indefinite as to be invalid. See Landry v. Daley, supra, at 958. We note that in both Cox v. State of Louisiana, supra, and Edwards v. South Carolina, 372 U.S. 229, 237, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963), the essential fault of the statutes was their ability to be applied to prohibit peaceful conduct. Here, this defect is absent. The intended act must be intended to be done with force or violence, thus removing it from the ambit of peaceful conduct protected by the First Amendment. See Feiner v. People of State of New York, supra, and Chaplinsky v. State of New Hampshire, supra. Those crimes which are denominated as against the peace are clearly delineated by the Missouri Statutes and by the common law. No guesswork is involved with this portion of the phrase. See also Heard v. Rizzo, supra. We also note that the Constitution uses the word "peace" or variations thereof in several places, i. e., "peacefully to assemble". It is difficult to strike as unconstitutional this phrase which utilizes similar language.
The greatest problem arises from the language "to the terror of the people". In Connally, supra, the Court pointed out that words which had a well-settled common law meaning were not unconstitutionally vague. As we construe this statute, the words "to the terror of the people" are utilized to incorporate the common law definition of unlawful assembly into this statute. As such, those words have such a well-settled common law meaning. The common law offense is defined in 4 Blackstone's Commentaries 146, as follows:
"To constitute an offense it must appear that there was common intent of persons assembled to attain purpose, * * * by commission of acts of intimidation and disorder likely to produce danger to peace of neighborhood, and actually tending to inspire courageous persons with well-grounded fear of serious breaches of public peace."
See also Heard v. Rizzo, supra; 91 C.J.S. Unlawful Assembly § 1, p. 495; and 46 Am.Jur. 127. The words "to the terror of the people", to have meaning within this statute must be construed to mean "tending to inspire courageous persons with well-grounded fear of serious breaches of public peace". Heard v. Rizzo, supra, 281 F.Supp. at 740, and Black's Law Dictionary at 1705. Furthermore, the statute requires that the persons involved have a specific intent, by force or violence, to do unlawful acts which would raise such a fear.
This Court, therefore, holds that section 562.150 is not unconstitutionally vague. See also Heard v. Rizzo, supra, at 737, upholding the Pennsylvania unlawful assembly statute which incorporates the common law offense; In re Bacon, 240 Cal.App.2d 34, 49 Cal.Rptr. 322 (1966), upholding the California statute; and Wright v. State, 217 Ga. 453, 122 S.E.2d 737 (1961), upholding that statute.
This Court further finds that this statute as so construed is not void for over-breadth. The statute proscribes only unprotected conduct. It is unequivocally clear that the state has a strong and legitimate interest in protecting against criminal acts of force or violence, including those acts designed to terrorize its people. It is equally clear that it *592 must be able to preserve domestic tranquility. In furtherance of this interest, it must be able to "nip in the bud" riots and may, therefore, regulate and proscribe unlawful assemblies. Because of the requirements heretofore set out, we believe this statute itself eliminates its application to the peaceful exercise of the rights of speech and assembly. We do not think that it sweeps within its bounds protected rights. The peaceful exercise of protected rights is excluded. Only when the intent to commit criminal acts with force and violence is manifested, may this statute be employed. As pointed out in Cox v. State of Louisiana, 379 U.S. at 562, 85 S.Ct. at 480, "mob law is the very antithesis of due process." See also Frank v. Mangum, 237 U.S. 309, 347, 35 S.Ct. 582, 59 L.Ed. 969 (1915), (Mr. Justice Holmes dissenting). We believe that the statute limits itself to application to demonstrations which have surpassed the area of First Amendment protection. As construed, it is not suggestive of a vehicle for the suppression of ideas. We can find no criminal act within the coverage of the statute, which when done with force or violence, would be protected by the First Amendment. Since the state has a strong and legitimate interest in prevention of mob rule and other criminal acts, we find that it may act through this statute to "nip" them in the bud.
Plaintiffs' contention that the statute is unconstitutional as applied to them will be dismissed as without merit. Plaintiffs' actions and speech were, in the opinion of this Court, "hard-core conduct that would obviously be prohibited under any construction", Dombrowski v. Pfister, supra, 380 U.S. at 491-492, 85 S.Ct. at 1124, 14 L.Ed.2d 22.
In view of the above decision, plaintiffs' prayer for injunctive relief will be denied as without merit.
This Court having found no violation of any of the civil rights of the plaintiffs, within the contemplation of 42 U.S.C. § 2000a, plaintiffs' attorneys' motion for fees under 42 U.S.C., section 2000a-3(b), will be denied.

APPENDIX A

"WHITEY" STRIKES AGAIN!!!
A message to the Black people of St. Louis about the recent killing of one Black brother (Cecil Lee Tunstall of 3000 block of Cass Avenue) and the serious wounding of another Black brother (Dennis Navens of 2400 block of Division) by several white racist hunkie cops. These animals (white cops) have struck twice in one month (Note: Lonnie and David Vanderson being brutally beaten by two white dogs (cops). The Black community will not allow the slaughtering of Black people by white racist dogs (cops) to continue. Let's look at some specific details about the Tunstall and Niven's case, a hunkie cop of a decoy squad was sent to Dayton and Jefferson at the 905 Liquor Store, flashing large sums of money (a fool) to provoke some Black person to attack him. Even though if the Black brothers did bust the dog (hunkie cop), does he have the right to kill a brother?
We can stop the killing of Black people by racist hunkie cops.
1) Join the Black Liberation Movement (B.L.M.) Requirements for joining (B.L.M.)
1 Black male and female committed until liberated totally.
2 Own a Non-registered gun (bazooka, M11, M14 Rifle etc.
*593 3 Vietnam War Veterans age limit19-30
4 Black women committed to Black Leadership.

"DOWN WITH THE WHITE ANIMAL"
A note to Black people of St. Louis about the hunkie's oppression of beautiful Black people. Black people in this city have suffered for 400 years in the ghettos, with rats bitting beautiful Black babies, no heat and hot water in the house during the winter months, white hunkie cops killing Black youth, Jewish merchants taking the money out of the Black community, and a Jewish hunkie (Samuel Burnstein) oppressing Black women by pulling them before a hunkie racist judge to oust them from the main office of H.D.C., "Show case Niggers" selling us down the drain. The above hunkie and hunkie lovers are our enemies.
The only way Black people can eliminate the hunkie's oppression is through an organized effort to take power to liberate Black people. We have got to support our Black brothers and sisters wrong of right (unity) in our effort to destroy racism in this country.