STATE of Missouri, Respondent,

v.

Steve MAST, Appellant.

No. 49789.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 15, 1986.

Howard L. Snowden, Private Atty., La Grange, for appellant.

Frederick Leo Westhoff, Pros. Atty., Canton, for respondent.

DOWD, Judge.

Defendant, Steve Mast, appeals his jury conviction on Count I, unlawful assembly in violation of § 574.040 RSMo (1979), a Class B misdemeanor, and on Count II, refusal to disperse from an unlawful assembly, in violation of § 574.060 RSMo (1979), a Class C misdemeanor. On Count I, defendant was sentenced to a fine of $250.00 plus costs. On Count II, defendant was sentenced to two days in jail plus a fine of $100.00 plus costs. The information was filed in Lewis County, and after a change in venue, a jury trial was held in the Knox County Circuit Court. Defendant appeals from these convictions.

On appeal, defendant contends the evidence was insufficient to support the convictions and it was therefore error not to grant his motions for judgments of acquittal.

In testing the sufficiency of the evidence by a motion for judgment of acquittal, the evidence must be viewed in the light most favorable to the state, assuming the evidence of the state and every reasonable inference therefrom to be true, and the evidence and inferences to the contrary are disregarded. *State v. Newton*, 637 S.W.2d 805, 806 (Mo.App.1982).

On October 31, 1984, Halloween night, defendant, a student at Northeast Missouri State College in Kirksville, drove to the town of Maywood so that he could participate in the traditional Halloween gathering with his friends. Defendant was aware of Maywood's reputation for "anything goes on Halloween." He had been in Maywood on Halloween in past years, and arrived in Maywood around 5:45 p.m. with a friend, Donnie Martin. Defendant was dressed in his ROTC army fatigues and his face was covered with a black substance. Defendant had a bundle of bottle rockets in his possession and Donnie Martin carried a can of spray paint in his back pocket.

After arriving in Maywood, defendant and Donnie Martin socialized with some friends in front of a general store. Jerry Callow, the deputy sheriff, and Steve Waters, the special deputy appointed for Halloween night, warned defendant and his friends "to keep it down and keep it within reason." At that time, the officers explained to them that seven or more gathered constituted an illegal assembly, but as long as they were not doing anything but having fun, then the officers had no objec-

tions. Moreover, Waters informed defendant that it was not illegal to possess bottle rockets, but it was illegal to fire the bottle rockets. Additionally, he confiscated Donnie Martin's can of spray paint because of previous acts of vandalism.

Throughout the course of the night, different unlawful activities transpired such as: bottle rockets were set off in close vicinity to the general store's gas pumps and in the direction of the police car; Mr. Seals' house was egged and a stop sign was placed on his front porch; fire bombs and M–80s were set off; and eggs, bottle rockets, and a beer bottle were all thrown in the direction of the officers and their patrol car. In fact, Officer Callow was struck by an egg.

All of the above occurrences are not attributable to the defendant, but in the course of the evening the officers saw the defendant set off one bottle rocket away from the crowd and the buildings. The officers had difficulty identifying and determining the members of the crowd who were taking part in the unlawful activities. At one point in the evening, Deputy Callow told the crowd that they were getting unruly and committing unlawful acts, and consequently he "asked them to break it up." In response to his request, the crowd divided up into groups of four or five, but these groups did not separate far from each other and proceeded to call the officers names. After the officers departed, the crowd regrouped and continued to set off bottle rockets and fire bombs and throw eggs. Shortly after 10:30 p.m., the two officers turned on the red lights of their patrol car, drove up to the scattering crowd and made some arrests. Waters saw defendant in the middle of the crowd, immediately prior to this time, but he did not see defendant after the arrests.

This is the first appellate attack on the present unlawful assembly statute (§ 574.-040 RSMo 1978). This statute provides in part:

1. A person commits the crime of unlawful assembly if he knowingly assembles with six or more other persons and agrees with such persons to violate any of the criminal laws of this state or of the United States with force or violence.

A presumption exists "that the intent of the legislature in enacting a statute is to serve the best interests and welfare of the citizenry at large." *Tribune Publishing Company v. Curators of University of Missouri*, 661 S.W.2d 575, 583 (Mo.App. 1983). This presumption must take into consideration the fact that the legislature did not intend to effect an unreasonable, oppressive or absurd result. *Supra* at 583. Consequently, when interpreting § 574.040, we must determine the legislature's intent from what can be necessarily implied from the language it employed, because the legislature did not expressly state its intention. By identifying the general purposes for enacting a statute and by identifying the problem sought to be remedied, we can ascertain legislative intent. *Sermchief v. Gonzales*, 660 S.W.2d 683, 688 (Mo. banc 1983).

■■■ Since § 574.040 was enacted, no Missouri case has interpreted this statute. However, other jurisdictions have addressed this issue interpreting similar statutes. The court in *Lair v. State*, 316 P.2d 225, 234 (Okla.Crim.App.1957), defined an unlawful assembly as being an assembly which consists of three or more persons assembled to do an unlawful act or who being assembled, attempt to do a lawful act in a violent or unlawful manner to the terror and the disturbance of the public in general. *See also* BLACK'S LAW DICTIONARY 1377 (5th ed. 1979). To constitute the offense of unlawful assembly, the participants must have a common purpose and act in concert. The intent or purpose necessary to render an assembly unlawful need not exist from the onset, but may be formed either before or at the time of the assembly. *Lair v. State, supra* at 234.

■■■ An unlawful assembly causes a disturbance of the public order so that it is reasonable for rational, firm and courageous persons in the neighborhood of the assembly to believe the assembly will cause injury to persons or damage to property

and will interfere with the rights of others by committing disorderly acts. *Lair v. State, supra* at 234; *State v. Simpson,* 347 So.2d 414, 415 (Fla.1977). The intent with which such persons assemble is the very offense of unlawful assembly in that this intent is reflected by the participants' acts, conduct and language. *Lair v. State, supra* at 235. The purpose of unlawful assembly statutes is to discourage assemblies which interfere with the rights of others and endanger the public peace and excite fear and alarm among the people. *State v. Hipp,* 298 Minn. 81, 213 N.W.2d 610, 615 (1973).

■■■ Even though a person does not individually commit a violent act which poses a clear and present danger of violence, this individual can be guilty of unlawful assembly. *In Re Wagner,* 119 Cal.App.3d 90, 173 Cal.Rptr. 766, 771 (1981). The statutory denunciation applies to the assembly at large. Annot., 71 A.L.R.2d 875 (1960). Consequently, each member of an assembly need not individually commit unlawful acts to render the assembly unlawful, but a person can become a member of an unlawful assembly by not disassociating himself from the group assembled and by knowingly joining or remaining with the group assembled after it has become unlawful. *In Re Wagner, supra* at 771. Whether a person acted knowingly and whether the necessary intent existed, are both questions of fact for the jury. *Supra* at 771.

> If it were necessary that each member of an unlawful assembly commit an unlawful act, before that member could be convicted then there would be no necessity to make participation in the unlawful assembly a crime. The independent unlawful act would itself be grounds for prosecution.

*Supra* at 771. In short, every person who is present and cognizant of the unlawful acts being committed by the other members of the assembly can be found guilty of being unlawfully assembled.

When applying the foregoing principles to the facts in this case, we must view the evidence in a manner most favorable to the state. At its inception, the gathering in Maywood on Halloween night was a lawful assembly, however as the night progressed, the participants' purpose in assembling changed. Undoubtedly, the assembly was disturbing the public peace and interfering with the rights of others. The persons in the neighborhood of the assembly had cause to fear the assembly would inflict damage to property and would commit disorderly acts. Throughout the evening, fire bombs, bottle rockets, M–80s, and eggs were being thrown at houses and people. Both Waters and Callow saw defendant fire a bottle rocket which is an unlawful act, according to one of the deputies. Defendant is no less guilty because he fired only one bottle rocket. Additionally, defendant drove his car across Mr. Seals' lawn.

■■■ Moreover, defendant had been in Maywood on previous Halloweens, and so he was aware of the type of activities that take place there on Halloween. Therefore, it is evident that defendant knew the purpose of the gathering on Halloween night. To be convicted of unlawful assembly, defendant did not have to participate or encourage every harmful act which occurred that night. For that matter, defendant need not have actually committed an unlawful act. His presence alone in the unlawful assembly was enough for conviction, because he knowingly assembled with the other members, and he was under a duty to disassociate himself from the group after other members of the group committed unlawful acts.

■■■ Defendant would have us construe the statutory section in such a manner so as to vitiate the purpose of the statute. We will favor a construction that avoids this unjust and unreasonable result. Defendant contends that no agreement existed between the group members, and consequently, he could not be guilty of participating in an unlawful assembly. Such a narrow reading of the statute would defeat its purpose and create an absurd result by making it almost impossible to satisfy the elements of an unlawful assembly. Even

though the group assembled did not expressly, verbally agree, their common unlawful purpose was expressed by their overt acts. Therefore, the members of the assembly intended to and in fact participated in an unlawful assembly. The assembly members' acts, conduct and language indicated their adoption of the unlawful conduct of the other members assembled. Moreover, defendant performed an unlawful act himself so his guilt is not established by his presence alone.

 The common law offense of unlawful assembly is defined as follows:

> To constitute an offense it must appear that there was common intent of persons assembled to attain purpose, * * * by commission of acts of intimidation and disorder likely to produce danger to peace of neighborhood, and actually tending to inspire courageous persons with well-grounded fear of serious breaches of public peace.

*Rollins v. Shannon,* 292 F.Supp. 580, 591 (E.D.Mo.1968) (quoting 4 Blackstone's commentaries 146). The purpose of an unlawful assembly statute is to penalize the members of assemblies when their conduct causes a disturbance or damage. *Supra* at 591. The members must meet and form a common purpose to violate any of the criminal laws, but they do not have to actually violate the law. *The New Missouri Criminal Code: A Manual for Court Related Personnel,* § 19.5 University of Missouri—Columbia School of Law 19–3 (1978). The state has a strong and legitimate interest in protecting against criminal acts of force or violence in order to preserve public tranquility and other rights belonging to the public in general. "In furtherance of this interest, it must be able to 'nip in the bud' riots and may, therefore, regulate and proscribe unlawful assemblies." *Rollins v. Shannon, supra* at 592. The gathering in Maywood on Halloween originally was a lawful one, but as the night progressed, the members of the assembly acted with common intent to attain a purpose which interfered with the rights of others by committing disorderly and unlawful acts.

Based on the foregoing principles, we hold there was substantial evidence to support the conviction of unlawful assembly. Point one is denied.

Defendant's second point on appeal is that the trial court erred in denying his motion for judgment of acquittal on the charge of refusal to disperse because the evidence was manifestly insufficient to sustain a conviction. Taking the evidence in the light most favorable to the state, the evidence was sufficient to show that on Halloween night an unlawful assembly had gathered in Maywood, and defendant had been lawfully warned to disperse. After hearing the warning, the defendant did as requested, but after a short period of time, he returned to the gathering. This evidence is sufficient to sustain his conviction for failure to disperse. Missouri's refusal to disperse statute states:

> 1. A person commits the crime of refusal to disperse if, being present at the scene of an unlawful assembly, or at the scene of a riot, he knowingly fails or refuses to obey the lawful command of a law enforcement officer to depart from the scene of such unlawful assembly or riot.

§ 574.060 RSMo (1978). Whether a person knowingly fails or refuses to obey the dispersal order is a question of fact for the jury. To be guilty of the charge of refusal to disperse, a person must be at the scene of an unlawful assembly and know of the command to disperse, and still refuse to obey. The evidence favorable to the state showed that defendant heard Callow order the crowd to disperse by telling it "to break it up." In response to this command, the gathering broke up into groups of four and five and then proceeded to regroup shortly thereafter. By regrouping, defendant in effect refused to obey the lawful command of Callow to depart from the scene of the unlawful assembly.

 Defendant alleges that the warning given was inadequate because it did not expressly order the crowd to go home or to leave town. Section 574.060 does not require a warning to expressly designate a location where the crowd is to disperse. A person who "knowingly fails or refuses to

obey the lawful command of a law enforcement officer to disperse from the scene of such unlawful assembly," is guilty of this crime. § 574.060 RSMo (1978). The warning could be reasonably understood to mean that the crowd was to leave the area. The failure of the warning to describe the area to be vacated has nothing to do with the defendant's failure to comply. After Callow warned the crowd to break it up, the crowd regrouped, thus suggesting that the crowd would have disregarded the warning in any event.

Words are to be interpreted according to their plain and ordinary meaning which is the commonly accepted dictionary definition. "Break up" is defined as "to disrupt the continuity or flow or to bring to an end." Webster's Collegiate Dictionary 177 (9th ed. 1984). A person of reasonable intelligence would understand the words "break it up" to mean that he is supposed to depart from the area. In total disregard and in defiance of the command, defendant remained in the area in question. By his inaction, defendant was not complying with the command to disperse. Defendant's second point on appeal, therefore, is denied.

For the foregoing reasons, the judgment of the trial court is affirmed.

REINHARD and CRIST, JJ., concur.