HENRY O. CHRISTENSEN AND ANOTHER v. C. M. REDMAN.[1]

November 5, 1954.

No. 36,272.

*Vennum, Newhall & Ackman,* for appellant.

*Dorsey, Colman, Barker, Scott & Barber,* for respondents.

[1]Reported in 66 N. W. (2d) 790.

KNUTSON, JUSTICE.

Plaintiff Oscar C. Ronken, who will be referred to hereinafter as plaintiff, is an attorney at law and has practiced his profession in Rochester, Minnesota, since 1914. Defendant, during the times involved herein, was engaged largely in the business of buying and selling commercial and mercantile property.

The E. A. Knowlton mercantile business had been conducted in Rochester for many years. About 1919 the building in which the business was conducted burned down. Thereafter, the E. A. Knowlton Realty Company was formed, and this company built a new building on the same lot, which was owned by the company. The building was leased to Clarence Knowlton, who conducted a mercantile business therein. Fifty percent of the capital stock of the company was owned by Clarence Knowlton, and the other fifty percent by Madge B. Knowlton, the widow of Clarence's brother George, individually and as trustee for her three sons. Clarence Knowlton and the other stockholders did not get along together. There had been considerable feuding over the years and some litigation over payment of rent and other matters.

Plaintiff had been attorney for Madge Knowlton for many years and was a trusted advisor in her legal affairs.

On March 20, 1943, defendant initiated negotiations with plaintiff which ultimately led to a sale of Madge Knowlton's stock in the company and to this litigation. On that date defendant wrote plaintiff that he understood that plaintiff had clients who owned interests in mercantile property in Rochester which might be for sale and that he was interested in purchasing such property. Considerable correspondence followed concerning property in Rochester, the original letters relating more to the possibility of acquiring property other than the Knowlton property. Ultimately the letters began to relate to the possibility of acquiring the Knowlton property.

On April 19, 1944, defendant, having obtained the address of Madge Knowlton from plaintiff, wrote her in California as follows:

"We would be interested in acquiring your real estate in Rochester consisting of the building occupied by the Knowlton Store and resi-

dence at 306 4th St. S. W. While we are not interested in residential property, as an investment we are in position to buy the two properties in combination, and would appreciate the opportunity of considering price that you would take for both properties."

On April 29, Madge Knowlton wrote plaintiff enclosing the letter which she had received from defendant and stating to plaintiff:

"I wanted you to know something about this in case of inquiries. I'm not selling my Realty stock at this time."

Thereafter, following more correspondence between plaintiff and defendant, a meeting was arranged by plaintiff between Madge Knowlton and defendant at Rochester. Further correspondence followed in which it appeared that Madge Knowlton's stock could not be obtained for the price defendant was willing to pay. On April 27, 1945, plaintiff wrote Mrs. Knowlton about the proposed sale, stating:

"I think the thing for you and the boys to do is to determine at what price you will sell. Now, I have talked a good deal with Mr. Redman, and I know some of the reasons that impel him to desire this property. I have not cared to take the responsibility of advising you whether you should sell or not, but after you have reached a conclusion that you care to sell, I think that I can negotiate with Mr. Redman and get your price more readily than you can yourself and, in addition, I am sure I can get Mr. Redman to pay all the expenses connected with the sale, including our fees.

"If this appeals to you, then, if you will fix the price at which you are willing to sell and will let us hear from you, I am sure we can be of service."

On May 1 Mrs. Knowlton wrote plaintiff a letter in which she said:

"* * * Following several interviews with Mr. Levine, Donald, contrary to a previous decision, made up his mind it was best to sell. He called me on the telephone and I agreed to the paper he had drawn up, since the sale depended upon the approval of the Court. Knowing that Mr. C. E. Knowlton had refused to sell to Stevensons, I doubted the completion of the deal. However such a transaction

would have eliminated troubles with Mr. Knowlton similar to those we've experienced during recent years.

"Therefore, *if at no expense to us,* you can arrange a settlement with Mr. Redman at the same figures Donald gave Mr. Levine, well go ahead, so long as the deal does not depend on any transaction between Mr. Redman and Mr. C. E. Knowlton. * * * It must be an out and out sale consummated for cash. We'll have a tremendous tax to pay. * * *

\* \* \* \* \*

"So our price for 50% of the Realty shares is $135000, but in addition we are to be paid our share of present cash assets." (Italics supplied.)

On June 1, 1945, plaintiff wrote defendant as follows:

"I think the only inducement to Madge Knowlton and her boys to sell is price. I do not know whether you would be interested to buy at the price required to move their interests.

"My belief is that it would take $135,000 to induce them to sell. There is a surplus that has accumulated in the treasury, and in addition to the foregoing, they claim that, and the purchaser would get no part thereof. *In addition a fee for our services such as is usual on transactions of this kind and magnitude would have to be paid by the purchaser."* (Italics supplied.)

On June 6 defendant answered as follows:

"Your letter received. I'll have a generous proposition for you in a few days. Will bring it to Rochester and get your clients to meet with us—in Rochester or Minneapolis—week of June 10.

*"You will be properly compensated on any deal I make."* (Italics supplied.)

These negotiations finally culminated in an offer by defendant, and on June 21 Donald B. Knowlton, as an attorney in fact for the other interested parties and for himself, executed a 45-day option to defendant to purchase the stock for $140,000 cash. The option was exercised, and the sale was completed to the entire satisfaction of Mrs. Knowlton and her sons.

134

This litigation thereafter arose out of the claim by plaintiff that he was entitled to one-half the commission earned by defendant. The stock purchased was sold to Clarence Knowlton for $154,000, resulting in a profit or commission of $14,000 less expenses amounting to $50. Defendant refused to pay plaintiff for his services, whereupon plaintiff started action to recover his share of the alleged commission earned by defendant.

While defendant denies that such conversation took place, the evidence sustains the jury's findings that shortly after defendant had written the letter of June 6, 1945, wherein he stated that plaintiff would be properly compensated, plaintiff and defendant met in the Radisson Hotel in Minneapolis and had a conversation regarding the payment of plaintiff's fee. Plaintiff's testimony regarding this conversation is as follows:

"This letter of Mr. Redman's on—dated June 6, saying that I would be properly compensated for any deal he made was not satisfactory because that left everything to him so I came to Mr. Redman's room in the Hotel Radisson. * * * I think he started the conversation and I interrupted him by saying, 'Mr. Redman, I don't care to proceed in this matter any further than I have now until I know what my own position is going to be in the matter of my own compensation'. And he said to me, 'I will divide my commission with you'. Then he had a folder, or rather a pad, a folder such as we have for our legal papers, and he opened it and turned the papers and he said, 'In this kind of a deal of this magnitude I am asking for a pretty substantial commission.' or words of that import, that meaning. And he paused a little while and turned some more of his papers and he said, 'In this case we should not be satisfied with a small commission'. I don't—I can't recall the exact words, but that was the meaning. 'I would not permit it', he said and then he said, 'In this case we can ask for at least for a commission of $10,000.00'. He thought a little while and he said, 'I don't know but what we can make it more than that'. In reliance on that promise I proceeded and relying on that promise I proceeded."

It is largely upon this conversation that plaintiff's right to recover rests.

The case was tried to a jury, resulting in a verdict in plaintiff's favor of one-half the commission earned by defendant. Alternative motions for judgment notwithstanding the verdict or a new trial having been denied, this appeal is from the order denying such motions.

Defendant contends (1) that the contract between plaintiff and defendant was illegal and void because plaintiff breached his fiduciary duty to Madge Knowlton in failing to disclose to her the arrangement existing between himself and defendant; and (2) that the words "divide my commission" do not mean to divide equally and, therefore, that the contract is so indefinite as to be unenforceable.

■ At the outset, there are certain facts which are not in dispute. That Mr. Ronken had been a trusted legal advisor for Mrs. Knowlton for many years is apparent. Apparent also is the fact that Ronken brought Mrs. Knowlton and defendant together and that it was through his efforts and as a result of his advice that she finally consented to sell her stock, knowing that it was to be acquired by Clarence Knowlton. It must also be admitted that all parties knew that Ronken was to be paid his fees and expenses by defendant. The evidence further shows that Mrs. Knowlton fixed the price at which she would sell and that plaintiff scrupulously refrained from having anything to do with that part of the sale of the stock. What he did was to negotiate with defendant to the end that the price fixed by Mrs. Knowlton was finally obtained. Mrs. Knowlton was satisfied with the deal. While it is true that, after the deal was completed and this action arose, she wrote plaintiff that she did not know that plaintiff was to share in the commission earned by defendant, it is equally as true that she fully understood that plaintiff was to receive his compensation from defendant or from the purchaser. She has never questioned plaintiff's right to be paid by defendant, nor does she do so now. There is no evidence to justify a finding that Ronken represented two parties. He repre-

sented Mrs. Knowlton only. Cases involving a broker or agent who secretly acts for both parties are not in point.

Defendant argues that plaintiff's position is inconsistent with his fiduciary relationship to his client because he might be tempted to sell to defendant, even though he were able to obtain a better price from someone else, in order to share in the commission. There is no showing that anyone else was interested in this stock. Nor was plaintiff authorized to sell to the highest bidder. Mrs. Knowlton fixed her own price, and plaintiff's services were confined to obtaining that price, which he did. As we said in Selover v. Isle Harbor Land Co. 91 Minn. 451, 459, 98 N. W. 344, 346:

"* * * Quite another question would arise if no fixed price had been established, and the agent was relied upon and expected to obtain the best figure possible * * *."

There can be no quarrel with the rule that one acting in a fiduciary capacity must exercise the utmost fidelity in discharging his trust to his principal. However, where the agent discloses to the principal what he intends to do and the principal acquiesces therein, there can be no claim of a breach of fiduciary relationship. The rule applicable here is stated in Kaercher v. Schee, 189 Minn. 272, 278, 249 N. W. 180, 182, 88 A. L. R. 294, as follows:

"* * * the broker must act in good faith towards his principal and that any fraud or wrongdoing on his part in that regard will prevent him from recovering any commission or compensation for his services from his principal, and under these rules the broker cannot himself become the purchaser or interested in the purchase of the property without the knowledge and consent of his principal. But these rules, as far as we are informed, are applied to cases where action is brought to recover commission from the principal, where the principal has agreed to pay a commission or pay the reasonable value of the broker's services. Where the principal asks a net price to himself and requires or authorizes the broker to get his compensation out of the purchaser, he in effect invites the broker to negotiate with the purchaser for his compensation and is not

further interested in that matter. In the absence of fraud on the part of the broker, the principal is not in a position to complain because the broker agrees with the purchaser to get compensation either in money or in property. Under such a contract, the principal must be held to have considered that the property to be sold had some excess value over the net price, so that the broker could make the sale with some agreement by the purchaser to compensate him in money or property for his services in addition to paying the net price to the owner."

An agent of one of the parties to a sale of property legally may make a contract to receive his compensation from the other party with the knowledge and consent of his principal. 8 Am. Jur., Brokers, § 165; Annotation, 14 A. L. R. 475; see, James E. Carlson, Inc. v. Babler, 144 Minn. 125, 174 N. W. 824.

Negotiations for the sale of this stock extended over a period of more than two years. Defendant argues that Mrs. Knowlton's price originally was higher than that which she ultimately obtained and that plaintiff may have induced her to accept less in order that his commission would be higher. Nowhere in the record does there appear the slightest suggestion that plaintiff ever influenced Mrs. Knowlton in fixing her initial price or in accepting a lesser amount. That was a part of the transaction left exclusively to her and her sons. Under the circumstances of this case, we believe that there was a sufficient disclosure to all concerned that plaintiff was to be paid by defendant, so there was no breach of a fiduciary relationship. It might have been better had the parties reduced their agreement to writing and had there been a full disclosure to Mrs. Knowlton of all the details. If that had been done, there probably would not have been any litigation over it. But we are satisfied that, if plaintiff had sued to recover the reasonable value of his services under the disclosures made in this case and the understanding which existed between plaintiff and Mrs. Knowlton, there could have been no legal objection to his right to recover from defendant. We do not believe that the fact that he demanded a share of the

138

commission earned should defeat his right to recover under the circumstances here shown to exist.

■ Defendant next contends that an agreement to divide his commission does not mean to divide it equally.

While there may be authority to the contrary, we believe that the better rule applicable to real estate brokers is that, in the absence of a contrary stipulation, an agreement for a division of compensation is deemed to contemplate an equal division. 12 C. J. S., Brokers, § 81; Ferguson v. Conklin (Tex. Civ. App.) 51 S. W. (2d) 622. We think that the same rule should apply here. In the light of the evidence in this case, it was not error for the trial court to instruct the jury that, if they found for plaintiff, he was entitled to recover one-half of the net commission earned by defendant.

We have examined the other errors assigned, but they require no discussion. We find no reversible error.

Affirmed.