STATE v. LINDA M. HIPP AND OTHERS.

213 N. W. 2d 610.

December 7, 1973—No. 43042.

*C. Paul Jones,* State Public Defender, and *Jon F. Tuttle* and *Wood R. Foster, Jr.,* Special Assistant Public Defenders, for appellants.

*Warren Spannaus,* Attorney General, *Keith M. Stidd,* City Attorney, and *Edward C. Vavreck,* Assistant City Attorney, for respondent.

ROGOSHESKE, JUSTICE.

Following a joint trial, defendants-appellants were found guilty by a Hennepin County Municipal Court jury of unlawful assembly in violation of Minn. St. 609.705(3), which provides:

"When three or more persons assemble, each participant is guilty of unlawful assembly, which is a misdemeanor, if the assembly is:

* * * * *

"(3) Without unlawful purpose, but the participants so conduct themselves in a disorderly manner as to disturb or threaten the public peace."

On May 7, 1970, a "demonstration protesting the Red Barn organization," presumably over the propriety of erecting a Red Barn restaurant in an area known as "Dinkytown" near the University of Minnesota campus, took place in front of an existing Red Barn restaurant also near the campus of the University of Minnesota and close to the intersection of Oak Street and Washington Avenue Southeast in the city of Minneapolis. When city police officers were called to the scene and failed in negotiating with the participants to voluntarily reduce the size and number of pickets, about 30 persons were arrested. Of those subsequently charged with violation of § 609.705(3), three pled

guilty to reduced charges of breach of the peace prior to the start of trial while at least three defendants could not be located at the time trial commenced. At the close of the state's evidence, the court dismissed the charge against nine defendants and the jury found two defendants not guilty and seven defendants guilty. The seven, namely, Linda Hipp, Richard Enga, Anne Schendel, Terry Parczyk, Patricia Parczyk, Paul Wojenski, and John Norstad, appeal from the judgment and from an order denying their motion for a new trial.

The issues properly before us on this appeal are (1) whether the statute quoted is unconstitutionally vague or overbroad on its face under the First and Fourteenth Amendments to the Federal Constitution; (2) whether it is unconstitutional as applied to the conduct or activity of the alleged participants; and (3) whether the evidence is sufficient to support the conviction of defendants Hipp, Schendel, and Enga.

Upon our limiting construction of the statute, we hold the statute constitutional on its face and as applied and affirm the convictions except as to the three defendants whose convictions are reversed for want of sufficient evidentiary support.

Viewing the evidence most favorably to sustain the convictions, as we must, the jury could find these facts: The demonstration in question commenced at about 2 p. m. on May 7, when 100 to 150 demonstrators crowded into the Red Barn restaurant dining area, designed for a capacity of about 80, and announced their intention to remain until the restaurant was closed for the day. They interrupted the normal business being carried on; pasted "Ban the Barn" signs on the windows; blocked the entrance to nondemonstrators; bent the frames of the two side doors; blocked the front door; and grabbed the keys from Russell Swanson, assistant manager of the restaurant, and threw them into the crowd. Swanson called Robert Lafferty, a vice president of the Red Barn Company, who in turn notified the city police and requested their assistance. Mr. Lafferty and several police officials arrived and succeeded in persuading the demonstrators

to leave the building, and all finally dwindled out by about 4:30 p. m. Some 75 or 80 began picketing in front of the entrance on the restaurant's concrete (porch) driveway, the sidewalk in front of the restaurant and adjoining properties, and at times spilling into the street. When the deputy chief of police joined a police inspector who was on the scene at about 4:30 p. m., he observed about 20 persons participating in the demonstration on the sidewalk in front of the restaurant. Believing the situation called for no action, the deputy chief left the scene without conversing with any of the participants and went to the University Police Department parking lot, some 3 blocks from the scene, where police officers were beginning to assemble in the event they would be needed. He gave orders there that the officers were to remain at the parking lot and, after about 20 minutes, he returned to the scene. He noticed that the number of pickets on the sidewalk in front of the building had increased to about 40 and that a large crowd of observers was gathering across the street. He then addressed some of the participants, urging them to limit the pickets to a single line of about 10 to 14 persons. He next entered the restaurant, joining the general manager, some of the employees, and three other supervising officers, to observe the situation. Some attempt by the participants was made to limit the number of the pickets, but in a short time a double line rather than a single line began picketing, and the participants, shouting obscenities, began urging others standing nearby to join the demonstration. At this time, someone threw a milk carton, splattering its contents against the large plate glass window fronting the street. By about 5:45 p. m., the participating demonstrators increased to 75 or 80, and the noise from beating on lawn chairs and shouting began to increase. The deputy chief then decided to give orders to call up the assembled officers from the parking lot, approximately 60 of whom had then gathered. In the meantime, the number of participants had increased, and one of them asked permission to use the bullhorn (which the officer had not used to this time) to speak to the group in an effort to get them

to disperse. A University official also spoke to the demonstrators, and perhaps a city alderman who was on the scene. The deputy chief then described the situation:

"But, the situation was the chanting was getting louder and the crowd was getting larger. I took the bull horn and said— indicated once again—asked them to limit the number of pickets. Somebody said, 'How many—Fourteen? Can't do that. Don't have the right.' I said, 'I am not here to exercise any rights or to take yours. I am just suggesting.' There was no response to that. Then I said, 'I'm declaring this an unlawful assembly.'

"Q. Because they had rejected your offer of 14 pickets?

"A. No. Because the street was blocked; crowd was getting noisier; the emotions were running high; the sidewalk was completely blocked; the private property of the Red Barn was completely filled; the profanities and the shouting, as I said before, in the street. In my opinion it was an unlawful assembly. I indicated to the group we would give them time to disperse. And a great many of them did leave."

The deputy chief, who had served with the Minneapolis Police Department for over 19 years, concluded:

"* * * [B]ased upon my experience, the situation had deteriorated and if we hadn't taken action there would have been destruction of property and possible injury."

■ The first issue raises for the first time a constitutional challenge to our unlawful assembly statute adopted as part of the 1963 revision of our criminal laws. In addressing this issue, we start with the fundamental that a law which forbids conduct or activities in language so vague that "men of common intelligence must necessarily guess at its meaning and differ as to its application" is unconstitutional on its face. Connally v. General Const. Co. 269 U. S. 385, 391, 46 S. Ct. 126, 127, 70 L. ed. 322, 328 (1926). Such laws violate the Federal constitutional standard of due process under the developing doctrine of vagueness and overbreadth when the language employed fails to define the

conduct or activities clearly enough to give fair notice of what is prohibited or specifically enough to avoid the potential of sweeping and improper applications which pose a significant danger to suppressing constitutionally protected speech and association. The difficulty in applying the doctrine of vagueness and overbreadth arises where the challenged statute not only plainly prohibits conduct or activity which is constitutionally within the power of the state to punish, such as obstructing traffic, blocking sidewalks, damaging property, or using "fighting" words— " 'those which by their very utterance inflict injury or tend to incite an immediate breach of the peace' "[1]—, but also, by employing general language, conceivably may be applied to conduct or activities protected by the constitutional right of speech and assembly. Coates v. City of Cincinnati, 402 U. S. 611, 91 S. Ct. 1686, 29 L. ed. 2d 214 (1971). When a defendant is charged under such a statute and the charge is based upon conduct which the statute clearly prohibits and which the state may constitutionally subject to proscription, it is no defense that the statute would be unconstitutionally vague or broad if conceivably it could also be interpreted "as applying to other persons or other situations in which its application might be unconstitutional." United States v. Raines, 362 U. S. 17, 21, 80 S. Ct. 519, 522, 4 L. ed. 2d 524, 529 (1960). Since the constitutionality of such a statute can only be challenged as applied in such a case, resolving the issue necessarily requires either knowledge of the conduct upon which a defendant stands convicted or at least the conduct with which he is charged. Coates v. City of Cininnati, 402 U. S. 617, 618, 91 S. Ct. 1690, 29 L. ed. 2d 219, 220 (White, J., dissenting). Where, however, a statute purports to regulate First Amendment rights of speech, even though the statute is neither vague nor overbroad nor otherwise unconstitutional as applied to conduct charged or found against the defendant, he is permitted to challenge its vagueness or overbreadth as it may hypo-

---

[1] Chaplinsky v. New Hampshire, 315 U. S. 568, 572, 62 S. Ct. 766, 769, 86 L. ed. 1031, 1035 (1942).

thetically be applied to others. Dombrowski v. Pfister, 380 U. S. 479, 85 S. Ct. 1116, 14 L. ed. 2d 22 (1965); N. A. A. C. P. v. Button, 371 U. S. 415, 83 S. Ct. 328, 9 L. ed. 2d 405 (1963).

"* * * And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute. * * * The statute, in effect, is stricken down on its face. This result is deemed justified since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights." Coates v. City of Cincinnati, 402 U. S. 620, 91 S. Ct. 1691, 29 L. ed. 2d 221 (White, J., dissenting).[2]

As we construe Minn. St. 609.705(3), its application is limited to prohibiting three or more assembled persons from conducting themselves in such a disorderly manner as to threaten or disturb the public peace by unreasonably denying or interfering with the rights of others to peacefully use their property or public facilities without obstruction, interference, or disturbance. Such disorderly conduct or activity may also take the form of uttering fighting words having an immediate tendency to provoke retaliatory violence or tumultuous conduct by those to whom such words are addressed.

While the requirement that the participants "conduct themselves in a disorderly manner" may be, as defendants argue, vague, uncertain, or susceptible of application which could infringe on protected First Amendment rights, such argument ignores the context in which the words appear. A fair and full reading compels the conclusion that the only misbehavior intended to be prohibited is that which disturbs or threatens the public peace, that is, "that tranquillity enjoyed by a community

---

[2] See, also, Papachristou v. City of Jacksonville, 405 U. S. 156, 92 S. Ct. 839, 31 L. ed. 2d 110 (1972); Gooding v. Wilson, 405 U. S. 518, 92 S. Ct. 1103, 31 L. ed. 2d 408 (1972); Colten v. Kentucky, 407 U. S. 104, 92 S. Ct. 1953, 32 L. ed. 2d 584 (1972); Grayned v. City of Rockford, 408 U. S. 104, 92 S. Ct. 2294, 33 L. ed. 222 (1972).

when good order reigns amongst its members." State v. Winkels, 204 Minn. 466, 468, 283 N. W. 763, 764 (1939). Both the language and intent of the statute are directed at regulating conduct and not pure speech. That intention is reflected by the commentary of the advisory committee which drafted the Criminal Code of 1963.[3] The emphasis, as was true of the common-law crimes of unlawful assembly, rout, and riot from which the statute is derived, is placed upon a breach of the peace, coupled with the committee's recognition of "the effect of crowd psychology which promotes the commission of crime." Its purpose is to discourage assemblies which get "out of hand," which interfere with the public, and thus disturb the public peace and provoke the commission of other and more serious crimes. So construed, the statute neither prohibits activity which is merely annoying to others nor invites discriminatory enforcement. It is limited to regulating only criminal conduct or activities, not peaceful protest, general obnoxiousness, or deviant life styles. See, Papachristou v. City of Jacksonville, 405 U. S. 156, 92 S. Ct. 839, 31 L. ed. 2d 110 (1972).

The Federal Constitution does not render the states powerless to regulate the conduct of demonstrators and picketers. Gregory v. City of Chicago, 394 U. S. 111, 113, 89 S. Ct. 946, 947, 22 L. ed. 2d 134, 137 (1969) (Black, J., concurring) ; Coates v. City of Cincinnati, 402 U. S. 611, 617, 91 S. Ct. 1686, 1690, 29 L. ed. 2d 214, 219 (White, J., dissenting). Indeed, demonstrating, picketing, and parading are "subject to regulation even though intertwined with expression and association." Cox v. Louisiana, 379 U. S. 559, 563, 85 S. Ct. 476, 480, 13 L. ed. 2d 487, 491 (1965).

Because of the nature of the offense, which contemplates a form of conduct repugnant to good order and not a specific act, the language of the statute must, as a practical necessity, be general to cover the countless variations of assemblies which can disturb or threaten the public peace. Accordingly, we cannot say that the language of § 609.705(3) is so vague that a person of

---

[3] Advisory Committee Comment, 40A M. S. A. p. 55.

common understanding cannot know that it forbids three or more assembled participants to so conduct themselves as to disturb or threaten the rights of other members of the public to have peace and good order prevail. We believe that any law-abiding person would have no difficulty in understanding what conduct is prohibited. Moreover, mere use of general language does not support a vagueness challenge, as the United States Supreme Court recently stated in Colten v. Kentucky, 407 U. S. 104, 110, 92 S. Ct. 1953, 1957, 32 L. ed. 2d 584, 590 (1972):

"* * * The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited."

Accordingly, we hold that § 609.705(3) is not unconstitutionally vague and that, since the statute as construed neither purports to regulate protected speech or association nor poses the potential of sweeping and improper applications which would infringe upon First Amendment rights, it is not overbroad.

However, defendants contend that as § 609.705(3) was applied to the conduct or activities of the alleged participants, it impermissibly infringed on their constitutional rights of speech and assembly. We do not agree. It is evident that the activity in question is the very conduct proscribed by the statute. Indeed, the jury, upon compelling evidence, undoubtedly found that the participating demonstrators, almost 80 in number, disrupted the food service operation of the Red Barn and damaged various portions of the restaurant's property. They impeded all vehicular traffic in the area in addition to completely blocking the private property of the Red Barn and preventing pedestrians from using the public sidewalk fronting the restaurant. As well as the endless stream of shouting and profanities which emanated from the demonstrators, it is clear that they also continued urging

noninvolved onlookers to join them in their protest. They disregarded pleas offered by several of their own number and by police, University, and city officials to avoid police confrontation and to conduct an orderly demonstration. They refused, after negotiation, to reduce the number of pickets and failed to obey the deputy chief of police's order to disperse. In short, the situation had deteriorated far beyond mere publication of a common grievance or difference of opinion. The evidence does not indicate that the demonstrators conducted themselves with even a semblance of decorum or regard for public order. Indeed, it is commendable that only well after all reasonable efforts to assure the peacefulness of the demonstration and maintenance of public order failed, and only after the situation gave rise to imminent alarm and peril, police officers were summoned to the scene to carry out arrests.

After listing the essential elements of the offense, the trial court, consistent with our construction of the statute, limited its application by instructing the jury:

"Now, keeping in mind the Minnesota Statute that I have just explained, you may not find the defendants guilty of breach of that Statute if their conduct was protected under the United States Constitution. You may find their conduct was protected under the Constitution, specifically under the First Amendment of the United States Constitution, which says: 'The Legislature shall make no law abridging the freedom of speech or the right of the people peaceably to assemble.' The defendants, under the United States Constitution, have a right to free speech and assembly. Sometimes the function of free speech under our system of government is to invite dispute. It may, indeed, best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with the conditions as they are, or even stirs people to anger. *Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have a profound unsettling effect as it presses for acceptance of an idea. Likewise, an assembly in itself may cause conditions of apprehension*

*and unrest. If the only threat or disturbance arose out of the anger of others, and that anger arose because of their disagreement with the views expressed by the defendants, then the defendants are not in violation of this Statute.* However, the Constitutional rights of speech and assembly and use of the public streets as a form, [forum] to express ideas, are not absolute. These rights may not be exercised so as to deny the rights of others. The rights of free speech and assembly, while fundamental in our democratic society, still does not mean that everyone with an opinion or belief may express such in an assembly at a public place. The Constitutional guarantee of liberty implies the existence of an organized society maintaining public order. *Therefore, if you decide that the evidence established that the defendants unreasonably denied or interfered with the rights of others to peacefully use the streets and sidewalks without obstruction, interference or disturbance, their conduct is not protected by the Constitution.*" (Italics supplied.)

In addition, the trial court stated that the jury was not required to accept the opinion of the deputy chief of police that the assembly was unlawful, instructing them:

"* * * The fact that in [the deputy chief's] opinion this was an unlawful assembly, is not binding in any way upon this jury. It is the sole and exclusive function of this jury to decide whether there was, in fact, an unlawful assembly." [4]

We therefore hold that the trial court did not unconstitutionally apply the statute to the participants in the unlawful assembly.

■ There remains the claim of defendants Linda Hipp and Anne Schendel that the evidence is insufficient to support their convictions. Without passing upon the propriety of the court's refusal to grant separate trials and its denial of motions to dismiss at the close of the state's case in chief, or the accuracy of the instructions to the jury as to what degree of participation

---

[4] In accord, see, Gregory v. Chicago, 394 U. S. 111, 113, 89 S. Ct. 946, 947, 22 L. ed. 2d 134, 137 (1969) (Black, J., concurring).

was required to find each defendant individually guilty, our careful examination of the evidence, considered in its entirety, compels the conclusion that neither defendant's conviction can be sustained. Defendant Hipp's unimpeached and unrefuted testimony makes clear that she did not arrive at the site of the demonstration in time to observe the picketing. When she did get there, she was told that two friends for whom she had been waiting "had been arrested and had been hurt." After her inquiries to police officers proved futile and upon being restrained from approaching the police van, she asked if she "could please be arrested," believing this to be "the only way" possible to find her friends. There is simply no evidence which would support a finding that she either engaged in, or intended her presence to be in aid of, the demonstrators' activities.

Likewise, the evidence is insufficient to support defendant Schendel's conviction. Although she did not testify in her own behalf, evidence of codefendants that she pleaded with a police officer not to arrest one of her girl friends, and thereafter physically tried to prevent him from doing so, at best could only support a charge of violating Minn. St. 609.50, obstructing a police officer in the performance of his duty—an offense not charged. The police officer whose testimony identified her as being present at the scene could neither recall arresting her nor what she was doing when he first observed her. It is fundamental that it is equally a denial of due process to convict a person upon a charge that was not made as it is to convict one upon a charge for which there is no evidence to support conviction. Garner v. Louisiana, 368 U. S. 157, 82 S. Ct. 248, 7 L. ed. 2d 207 (1961).

The remaining defendants, except defendant Richard Enga, either admitted active participation in the demonstration or the evidence permitted the jury to infer such participation, or at least conduct which was intended to give aid to active participants. As to defendant Enga, who was not represented by counsel in this court, we are not satisfied that the record contains sufficient evidence of his wrongful participation, and we conclude,

without detailing the basis therefor, that his conviction should be reversed and he should be granted a new trial. See, State v. Johnson, 282 Minn. 153, 163 N. W. 2d 750 (1968).

Affirmed except as to defendant Enga, who is granted a new trial, and as to defendants Hipp and Schendel, whose convictions are reversed and the charge against each dismissed.

Affirmed in part and reversed in part.

KELLY, JUSTICE (concurring in part and dissenting in part).

I concur in the decision and opinion with one exception. I dissent to that portion of the opinion which would reverse the conviction of defendant Schendel. The defendant's proved attempt to prevent a police officer from arresting a participant in the disorder is evidence that she participated in the unlawful assembly. True, her conduct could support a charge of violating Minn. St. 609.50, obstructing a police officer in the performance of his duty, but I cannot concede that there was no evidence to support the charge upon which she was convicted.

PETERSON, JUSTICE (concurring in part and dissenting in part). I join in the opinion of Mr. Justice Kelly.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.