STATE of Minnesota, Appellant,

v.

Timothy Alan CAMPBELL,
Respondent.

No. A08–0218.

Court of Appeals of Minnesota.

Sept. 30, 2008.

Lori Swanson, Attorney General, Jennifer J. Hasbargen, Assistant Attorney General, St. Paul, MN, for appellant.

Charles A. Ramsay, Daniel J. Koewler, Charles A. Ramsay & Assoc., P.L.L.C., Roseville, MN, for respondent.

Considered and decided by LANSING, Presiding Judge; MINGE, Judge; and MUEHLBERG, Judge.*

## OPINION

MINGE, Judge.

Appellant State of Minnesota challenges a district court decision (a) finding Minn. Stat. § 609.2335, subd. 1(1) (2002), unconstitutionally vague as applied to respondent; and (b) dismissing charges against respondent for financial exploitation of a vulnerable adult. Respondent argues that if we conclude the statute is constitutional, we should apply the rule of lenity and construe the statute narrowly so as not to apply to respondent's conduct. Because we conclude that the statute is constitutional and that application of the rule of lenity is not appropriate, we reverse and remand.

## FACTS

This case arises from appellant State of Minnesota's prosecution of respondent

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

Timothy Alan Campbell for violations of Minn.Stat. § 609.2335, subd. 1(1) (2002),[1] which criminalizes the financial exploitation of a vulnerable adult. Respondent, a former investigator in the financial crimes unit of the Duluth Police Department, was the younger son of L.C., the vulnerable adult. L.C. was a longtime resident of Duluth. She died November 7, 2004. L.C.'s older son and only other child is Scott Campbell, who also served as a Duluth police officer.

L.C. began having cognitive difficulties in 2002 and was diagnosed with dementia, likely Alzheimer's, following a hospitalization in November 2002. After this diagnosis, L.C. briefly lived with Scott Campbell. Scott had been her attorney-in-fact pursuant to a power of attorney (POA) executed in 1998. In early 2003, L.C.'s psychiatrist urged the family to arrange for her to live in an assisted-living facility or nursing home. L.C. had worked as a nurse in such facilities for much of her career and opposed such a move. Suspecting Scott of being a proponent of such a change, on January 20, 2003, L.C. revoked Scott's status as attorney-in-fact.

On February 6, 2003, L.C. opened new joint checking and savings accounts with respondent and transferred all of her money into those accounts. There is no claim that respondent contributed anything to the accounts. On February 17, 2003, respondent brought L.C. to an attorney for preparation of a new POA, appointing respondent as L.C.'s attorney-in-fact. On March 24, 2003, L.C. executed the new POA, which allowed self-gifting. The law office that prepared the POA sent respondent a letter outlining his obligations as attorney-in-fact, but held the POA until

September 3, 2004, when respondent obtained a copy.

The state introduced evidence that, between February 2003 and September 2004, respondent exhausted the joint accounts. The state also introduced evidence that, within ten days after respondent received a copy of the POA appointing him attorney-in-fact for his mother, respondent closed the joint savings account and withdrew $18,048.48 from the joint checking account for his use. Respondent's defense at trial was that L.C. consented to the criticized withdrawals, that a significant portion of the money was used to build an addition to his home that included a living space which L.C. would have used had her health allowed, that all of L.C.'s expenses were otherwise paid, and that as the only other person on the joint accounts he would succeed to any remaining balances upon L.C.'s death.

In September 2004, Scott Campbell became aware of the depletion of L.C.'s accounts. Scott brought the matter to the attention of the Duluth Police Department and filed a vulnerable-adult report with social services. Toward the end of September 2004, Scott brought L.C. to an attorney, where she revoked the POA naming respondent attorney-in-fact and executed a new POA reappointing Scott. Scott took steps to establish a guardianship or conservatorship for L.C., but L.C.'s November 7 death occurred before the process was completed.

After L.C.'s death, there was a criminal investigation into respondent's actions regarding L.C.'s finances. Scott Campbell was involved with the investigation and referred a Duluth police officer working on the case to the Minnesota Attorney Gener-

---

**1.** Although we cite to the 2002 version of Minn.Stat. § 609.2335, subd. 1(1), which was in effect at the time of respondent's first alleged violation of the law, we note that there have been no substantive revisions to the statute during the period in which respondent is alleged to have been financially exploiting a vulnerable adult.

al's office. The Attorney General's office subsequently investigated and ultimately charged respondent with three counts of theft by false representation and three counts of financial exploitation of a vulnerable adult in violation of Minn.Stat. § 609.2335, subd. 1(1).

A jury trial was held. During the trial, respondent moved to dismiss the financial-exploitation charges on the ground that Minn.Stat. § 609.2335, subd. 1(1) is unconstitutional. The district court reserved ruling on the motion until the conclusion of the jury trial. After the prosecution rested, the district court dismissed the three counts of theft by false representation, leaving the three counts of financial exploitation of a vulnerable adult to go to the jury for a verdict. The jury was unable to reach a verdict on those charges, and the district court declared a mistrial. Following the mistrial, the district court requested briefing on the constitutional issue. The district court found that the challenged provision is unconstitutionally vague as applied to respondent and dismissed the vulnerable adult charges against him. This appeal follows.

## ISSUES

I. Did the district court err by ruling that Minn.Stat. § 609.2335, subd. 1(1) (2002) is unconstitutionally vague as applied to respondent's expenditure of funds from joint accounts established by his mother?

II. Is application of the rule of lenity appropriate to narrow the reach of Minn. Stat. § 609.2335, subd. 1(1) (2002) so as not to cover respondent's conduct?

## ANALYSIS

### I.

The posture of this case is that there has been a jury trial, the jury deadlocked, the case was expected to be retried, and before retrial, the district court ruled the applicable statute unconstitutional. Thus, what was a posttrial determination has become a pretrial order barring the state from retrying the case. In effect, this appeal is from a pretrial order, and as such, the state must (1) establish clearly and unequivocally that the district court's order will have a critical impact on the state's ability to prosecute respondent successfully; and (2) show that the district court erred. *State v. Kim,* 398 N.W.2d 544, 547 (Minn.1987); *see also* Minn. R.Crim. P. 28.04, subd. 2(1).

■ Because the district court's constitutional ruling has resulted in dismissal, the ruling clearly has a critical impact on the state's case, and the first requirement is met. *See State v. Holmes,* 569 N.W.2d 181, 184 (Minn.1997) (stating that the dismissal of a charge following suppression of all the evidence clearly meets the critical impact element). The second requirement presents the crucial question: Did the district court err by ruling that the challenged provision was unconstitutionally vague as applied to respondent's conduct? Constitutional challenges are questions of law, which we review de novo. *State v. Bussmann,* 741 N.W.2d 79, 82 (Minn.2007). In conducting this review, we recognize that "Minnesota statutes are presumed constitutional, and our power to declare a statute unconstitutional [is] exercised with extreme caution and only when absolutely necessary." *In re Haggerty,* 448 N.W.2d 363, 364 (Minn.1989).

The state argues that the district court erred by concluding that Minn.Stat. § 609.2335, subd. 1(1), is unconstitutionally vague as applied to the facts of this case. The statute provides:

Subdivision 1. **Crime.** Whoever does any of the following commits the crime of financial exploitation:

(1) in breach of a fiduciary obligation recognized elsewhere in the law, including pertinent regulations, contractual obligations, documented consent by a competent person, or the obligations of a responsible party under section 144.6501 intentionally fails to use the financial resources of the vulnerable adult to provide food, clothing, shelter, health care, therapeutic conduct, or supervision for the vulnerable adult.

Minn.Stat. § 609.2335, subd. 1(1).

■■■ "The void-for-vagueness doctrine requires that a legislative enactment define a criminal offense with sufficient definiteness and certainty that 'ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " *State, City of Minneapolis v. Reha*, 483 N.W.2d 688, 690–91 (Minn.1992) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983)). Statutes imposing criminal penalties require a higher standard of certainty. *Id.* at 691. However, "the vagueness doctrine is based in fairness and is not designed to 'convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.' " *Id.* (quoting *Colten v. Ky.*, 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972)). We do not expect mathematical certainty from the English language, and a statute that is flexible and reasonably broad will be upheld if it is clear what the statute, as a whole, prohibits. *Id.* Furthermore, although there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls, that diffi-

culty does not provide sufficient reason to hold the challenged language too vague to define a criminal offense. *State v. Davidson*, 481 N.W.2d 51, 56 (Minn.1992).

■■■ We note that our scrutiny is more demanding when a defendant challenges a statute implicating fundamental constitutionally protected activity, such as speech and assembly, versus a statute prohibiting conduct that is constitutionally within the power of the state to punish, such as blocking sidewalks or damaging property. *See State v. Hipp*, 298 Minn. 81, 86, 213 N.W.2d 610, 614 (1973). In the case of a statute that purports to regulate First Amendment rights, a defendant is permitted to challenge the statute on its face, that is to challenge the hypothetical vagueness of the statute as applied to others, even if the statute is neither vague nor overbroad as applied to the defendant. *Id.* at 86–87, 213 N.W.2d at 614. By contrast, when a defendant is charged with conduct that the state may constitutionally prohibit, it is no defense that the statute may conceivably be unconstitutionally vague as applied to other situations. *Id.* at 86, 213 N.W.2d at 614; *see also State v. Becker*, 351 N.W.2d 923, 925 (Minn.1984) ("It is well-settled that vagueness challenges that do not involve First Amendment freedoms must be examined in light of the facts at hand.").

Because there is no claim that Minn. Stat. § 609.2335, subd. 1(1) prohibits the exercise of a constitutionally protected activity such as speech or assembly, we consider whether the statute is unconstitutionally vague as applied to the alleged conduct of respondent that gave rise to the criminal charges. *See Reha*, 483 N.W.2d at 691. In so doing, we consider whether respondent *actually* received fair warning of the criminality of his conduct from the statute and whether the state *actually* en-

forced the statute against him in an arbitrary and discriminatory manner. *Id.* Although this matter comes before us as a pretrial appeal, we have the advantage of an existing record from the initial trial and that record provides the factual context for our analysis.

### A. Sufficiency of Notice

The state contends that an ordinary person in respondent's position would understand that his alleged acts of self-dealing were prohibited by Minn.Stat. § 609.2335, subd. 1(1). Respondent maintains that the phrases "in breach of a fiduciary obligation recognized elsewhere in the law" and "intentionally fails to use the financial resources of the vulnerable adult to provide food, clothing, shelter, health care, [etc.]" provided insufficient notice that his alleged conduct was prohibited by the statute. We address these phrases in turn.

### 1. Fiduciary Obligation

The most difficult question raised in this appeal is whether Minn.Stat. § 609.2335, subd. 1(1) provided respondent with fair warning that he could be "in breach of a fiduciary obligation recognized elsewhere in the law" given the circumstances surrounding his personal and financial relationship with his mother.

We first examine the plain meaning of the words used in the phrase. The word "fiduciary" is clearly recognizable by its common meaning: "[o]f or relating to a holding of something in trust for another." *The American Heritage Dictionary* 656 (4th ed. 2000). "Obligation" is also widely understood as an "act of binding oneself by a social, legal, or moral tie," and a "social, legal, or moral requirement ... that compels one to follow or avoid a particular course of action." *Id.* at 1212. The phrase "recognized elsewhere in the law" is admittedly broad. However, "elsewhere in the law" is statutorily defined to include "pertinent regulations, contractual obligations, documented consent by a competent person, or the obligations of a responsible party under [Minn.Stat. § ]144.6501." Minn.Stat. § 609.2335, subd. 1(1). This language directs the reader to apply state common and statutory law to the relationship between the parties in order to determine whether fiduciary duties exist.

Fiduciary relationships arise in Minnesota in varied contexts. Generally, such a relationship exists "when confidence is reposed on one side and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal." *Toombs v. Daniels,* 361 N.W.2d 801, 809 (Minn.1985) (quotation omitted); *see also Carlson v. Sala Architects, Inc.,* 732 N.W.2d 324, 330–31 (Minn.App.2007) ("A fiduciary relationship is characterized by a 'fiduciary' who enjoys a superior position in terms of knowledge and authority and in whom the other party places a high level of trust and confidence." (quoting *Toombs,* 361 N.W.2d at 809)), *review denied* (Minn. Aug. 21, 2007). The determination of whether a fiduciary relationship exists is a question of fact. *See Toombs* 361 N.W.2d at 809.

A fiduciary relationship may or may not involve a familial relationship. *See id.* (fiduciary relationship existed when the person claiming a beneficial interest in a family trust had a familial relationship with two of the trustees and had given over complete control of her financial affairs to one of the trustees); *Rice v. Perl,* 320 N.W.2d 407, 411 (Minn.1982) (an attorney as fiduciary); *cf. Carlson,* 732 N.W.2d at 331 (holding that while an architect/client relationship is not a fiduciary relationship per se, the facts of a particular case might create such a relationship).

 A fiduciary relationship is implicit in the creation of a POA. *See* Minn. Stat. § 523.21 (2006) ("In exercising any power conferred by [a POA], the attorney-in-fact shall exercise the power in the same manner as an ordinarily prudent person of discretion and intelligence would exercise in the management of the person's own affairs and shall have the interests of the principal utmost in mind."). Furthermore, a person acting as an attorney-in-fact under a POA "is an agent, one who stands in the shoes of a principal." *Northfield Care Ctr., Inc. v. Anderson,* 707 N.W.2d 731, 737 (Minn.App.2006). And it is black-letter law that an agent "is a fiduciary with respect to matters within the scope of [the] agency." Restatement (Second) of Agency § 13 (1958); *see also Church of the Nativity of Our Lord v. WatPro, Inc.,* 491 N.W.2d 1, 5 (Minn.1992) ("An agency relationship is [a] fiduciary relationship ...." (quotation omitted)), *overruled on other grounds by Ly v. Nystrom,* 615 N.W.2d 302, 314 n. 25 (Minn.2000). The relationship between an attorney-in-fact and a principal under a POA is a fiduciary one.

Whether joint tenants on multi-party accounts have a fiduciary obligation to one another is not as well developed as the law governing the obligations of an attorney-in-fact under a POA. But we disagree with the district court's conclusion that the statute is insufficiently definite solely because it is difficult to determine whether fiduciary obligations exist between holders of joint bank accounts. Although joint account owners hold a presumptive right of survivorship to funds remaining in joint accounts, "[a] joint account belongs, during the *lifetime* of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent." Minn.Stat. § 524.6–203(a) (2006) (emphasis added). In the case of *Kemp v. Holz,* 149 Minn. 237, 239, 183 N.W. 287 (1921), the Minnesota Supreme Court provided the following statement on a joint account:

> If this [joint account] deposit remained the sole property of [the decedent], and the entry of de[cedent's son]'s name as a joint depositor was for convenience only, so that the money might be withdrawn by the son when the father, because of infirmity or death, could not do so, this action [by the estate for funds taken from the joint account by decedent's son] is well brought. But ... [if] the transaction at the bank amounted to a gift inter vivos ... no recovery could be had.

*Id.* at 288. Indeed, the very ownership by a surviving joint account owner may not even arise if a fact-finder determines that a joint account was created through the violation of a fiduciary duty. *In re Estate of Nordorf,* 364 N.W.2d 877, 879 (Minn. App.1985) (citing *Carlson v. Carlson,* 363 N.W.2d 803 (Minn.App.1985)).

 We conclude that fiduciary obligations may be, but are not necessarily a part of, joint account arrangements. We recognize that the joint account is a starting point for analysis; it establishes a financial relationship. When each party is able to make unlimited withdrawals, there are clearly opportunities for abuse. To enter into the relationship, some level of trust exists between or among the parties to the account. The relationship and the trust may be nominal or far reaching. The important point is that in addition to the joint account, other factors must be weighed in determining whether a fiduciary relationship exists. These factors include the following: (1) the legal, familial, or personal relationship between the parties; (2) the capacity or sophistication of the parties; (3) who contributed the funds to joint accounts and in what ratio; and (4) the parties' understanding of their respec-

tive roles and responsibilities within the relationship. We do not suggest that this is an exhaustive list. In a criminal prosecution, the existence of a fiduciary relationship is a factual determination. *Cf. Toombs,* 361 N.W.2d at 809 (dealing with determination of fiduciary relationship in civil proceeding). Although the determination requires a judgment call, it is not so inherently elusive that it is not reasonably ascertainable or that it cannot be established beyond a reasonable doubt.

With this understanding of the different contexts in which fiduciary relationships arise in Minnesota and the complexities created by respondent's status as a joint account holder with the vulnerable adult, we examine the nature of the relationship between respondent and his mother (as shown by the evidence presented during the first trial) and consider whether Minn. Stat. § 609.2335, subd. 1(1) provided respondent with a fair warning that he could be in breach of a fiduciary obligation owed to a vulnerable adult in violation of the law.

First, the trial record indicates that there was a strong familial relationship between L.C. and respondent, that she placed confidence and trust in her youngest son, and that she gave respondent a significant degree of access and control over her financial affairs. *See Toombs,* 361 N.W.2d at 809 (identifying familial relationship, degree of control, and confidence reposed as supporting a finding of fiduciary relationship).

Second, testimony established that L.C. was considered a vulnerable adult following her diagnosis of dementia in November 2002. The prosecution introduced evidence of the details of her condition and evidence that respondent knew of this diagnosis at that time. It appears that L.C. had diminished capacity during the time

period in which respondent is alleged to have spent her money without consent.

Third, L.C. contributed all of the funds to the joint accounts, and respondent apparently contributed nothing. Notwithstanding respondent's status as a joint account holder, those funds did not belong to him personally during L.C.'s lifetime, absent evidence of a different intent. *See* Minn.Stat. § 524.6–203(a).

Fourth, L.C. had designated respondent as her attorney-in-fact, which required that respondent keep L.C.'s best interests in mind. L.C.'s former attorney drafted the revocation of the earlier POA appointing Scott Campbell as attorney-in-fact, but that lawyer declined to prepare a new POA appointing respondent attorney-in-fact because "[L.C.] didn't seem as ... competent ... as she did five years before and ... I was concerned whether or not she was competent to [appoint respondent her new primary attorney-in-fact] and I was also concerned whether or not that decision would be in her best interest." Following this refusal by one attorney, respondent brought his mother to another attorney to have a new POA prepared shortly after he became a joint account holder with her. By March 2003, L.C. had signed the new POA. Although the POA was not given to respondent until September 2004, the drafting lawyer sent respondent a letter outlining respondent's obligations as attorney-in-fact under the new POA in March 2003. That letter stated:

> The [POA] create[s] what in the law we consider to be a fiduciary status. This means you have a position of trust with respect to any of the activities that you perform as attorney-in-fact.... [A]any action you may take must be solely for the benefit of the person who has created the [POA]. At no time, nor under any circumstances, is it intended that the [POA] would or could be exercised

or used to benefit either yourself or other parties.

The existence of this POA relationship between respondent and his mother presents an additional factor for the jury to consider in determining whether there was a fiduciary relationship recognized by common or statutory law. The fact that it contained a power of self-gifting and was held by the attorney for more than one year does not negate its significance. It existed and indicated that L.C. placed a level of trust in respondent. The attorney's March 2003 letter specifically referred to the "fiduciary status" and the impropriety of self-dealing.

Fifth, the parties' intent in creating the relationship will always be a paramount factor in determining whether a fiduciary relationship exists. Whether L.C. opened the joint accounts with respondent for convenience only, whether she intended to gift the money to respondent, or whether she intended to create in respondent a presumptive right of survivorship upon her death could affect the outcome in any future prosecution. *See Kemp*, 149 Minn. at 239, 183 N.W. at 288.

Ultimately, the trial record shows that respondent took $107,071.29 from his mother's checking and savings accounts from February 2003 through September 2004. This included $27,136.32 for a new vehicle; $2,238.80 for airline tickets for a trip for several people to Nevada; $25,514.91 for home construction and building supplies; $37,596.48 in personal cash withdrawals; $13,000 in checks payable directly to respondent and his signifi-

cant other; and another $2,199.78 for miscellaneous personal expenses. This total of $107,686.29 was offset because respondent made one rent payment of $615 for the benefit of his mother from his personal funds. There were multiple deposits of retirement and other benefits payable to L.C. into the joint accounts. In addition to the amounts withdrawn by respondent for his own benefit, there were withdrawals in the amount of $34,275.71 from the joint accounts between February 2003 and September 2004 for L.C.'s expenses. In sum, about 75% of the withdrawals during this time benefited respondent and only 25% of the withdrawals were for L.C.'s expenses.

Given all of the evidence regarding respondent's conduct introduced at the first trial, we conclude that a person in his position would have had substantial reason to believe that he was in a fiduciary relationship as stated in Minn.Stat. § 609.2335, subd. 1(1), and that the statute is not unconstitutionally vague as applied to the facts at hand.

In reaching this conclusion, we do not determine that the facts establish beyond a reasonable doubt that respondent actually had a fiduciary obligation. The fact-finder must make that determination. But we conclude that when there are joint bank accounts and a variety of other factors indicating a possible fiduciary relationship between a vulnerable adult and a person accused of misappropriating the vulnerable adult's financial resources, Minn.Stat. § 609.2335, subd. 1(1) is not unconstitutionally vague.[2]

---

**2.** We note that other states criminalize financial exploitation of vulnerable adults. For example, in Florida, "[e]xploitation of an elderly person or disabled adult" includes

> [k]nowingly, by deception or intimidation, obtaining or using, or endeavoring to obtain or use, an elderly person's or disabled adult's funds, assets, or property

> with the intent to temporarily or permanently deprive the elderly person or disabled adult of the use, benefit, or possession of the funds, assets, or property, or to benefit someone other than the elderly person or disabled adult, by a person who . . . [s]tands in a position of trust and confidence with the elderly person or disabled adult.

## 2. Nature of Expenditures

■ Next we consider the statutory phrase making it a crime for a person acting in a fiduciary capacity to "intentionally fail[ ] to use the financial resources of [a] vulnerable adult to provide food, clothing, shelter, health care, therapeutic conduct, or supervision for the vulnerable adult." Minn.Stat. § 609.2335, subd. 1(1). Assuming the state can prove beyond a reasonable doubt that a fiduciary relationship exists between a defendant and a person considered a vulnerable adult under Minn.Stat. § 609.232, subd. 11 (2006), the law requires the fiduciary to spend the vulnerable adult's money on the vulnerable adult's needs. We recognize that the evidence at the first trial shows that L.C.'s basic needs were being met at the time of her death. The question is whether in this circumstance the payment/use provision of the statute is impermissibly vague.

The statute directly prohibits the intentional failure to use the financial resources of the vulnerable adult to provide for the items discussed in the statute. The plain language of Minn.Stat. § 609.2335, subd. 1(1) does not allow a fiduciary unfettered freedom in spending a vulnerable adult's excess financial resources just because basic needs are otherwise paid. Such a reading would create an absurd result. *See State v. Murphy,* 545 N.W.2d 909, 916 (Minn.1996) (rejecting a narrow interpretation of the terroristic threats statute that would produce absurd results).

Expenditures other than those listed in section 609.2335, subdivision 1(1) are not necessarily prohibited. We acknowledge that section 609.2335, subdivision 1(1) does not address the extent to which a fiduciary may spend a vulnerable adult's money on, for example, gifts for caregivers or family members, or travel and entertainment for the vulnerable adult. Some expenditures may be related to a vulnerable adult's needs, even if not made for basic life necessities. Furthermore, if a vulnerable adult or other person gives competent consent for expenditures on items unrelated to food, clothing, shelter, health care, therapeutic conduct, or supervision, the state will not be able to prove beyond a reasonable doubt that a fiduciary obligation has been breached. *See Christensen v. Redman,* 243 Minn. 130, 136, 66 N.W.2d 790, 794 (1954) ("[O]ne acting in a fiduciary capacity must exercise the utmost fidelity in discharging his trust to his principal. However, where the agent discloses to the principal what he intends to do and the principal acquiesces therein, there can be no claim of a breach of fiduciary relationship.").

If the state can prove its allegation that respondent intentionally used L.C.'s financial resources for respondent's personal benefit, then respondent has necessarily "intentionally fail[ed] to use the financial resources" for L.C.'s care and basic needs. We conclude that the statute provides sufficient notice for an ordinary person to understand that, if he or she is in a fiduciary relationship with a vulnerable adult, he or she cannot spend the financial resources of the vulnerable adult on items unrelated to care or welfare of that adult without appropriate permission, especially when the items purchased principally benefit the fiduciary. We recognize that respondent asserts that L.C. approved of certain major expenditures. If L.C. did so consent and she was competent, such consent or approval would be a defense to the criminal charges.

## B. Arbitrary and Discriminatory Enforcement

■ Respondent contends that the challenged provision engenders arbitrary

Fla. Stat. § 825.103(1)(a) (2006). Important terms and phrases are further defined. *See id.,* § 825.101. The Florida statute avoids some of the uncertainty of our statute.

and discriminatory enforcement. "[T]he *potential* for arbitrary and discriminatory enforcement is a legitimate concern with respect to any law." *Reha,* 483 N.W.2d at 692. A law fails to meet due-process standards when "it leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Bussmann,* 741 N.W.2d at 83 (quotation omitted).

 Here, respondent alleges that discriminatory and arbitrary enforcement existed because his brother, Scott Campbell, a Duluth police officer, was involved with the initial investigation of respondent's conduct, because the county attorney apparently did not prosecute, and because the Attorney General's office ultimately handled the prosecution based on a referral prompted by Scott Campbell. However, such allegations are not relevant to the question of whether the statute itself provides judges, attorneys, law enforcement, and jurors with fixed legal standards for determining whether particular conduct is prohibited in a given case. We have already determined that Minn.Stat. § 609.2335, subd. 1(1) provided respondent with sufficient notice that his conduct would violate the law. We further note that a prosecutor has the burden of proving beyond a reasonable doubt the existence of a fiduciary relationship, breach of a fiduciary obligation, and intent to violate the law by failing to use the financial resources of a vulnerable adult for his or her care. This prosecutorial burden greatly minimizes the risk of discriminatory and arbitrary investigation and enforcement. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982) (recognizing that a scienter requirement may mitigate a law's vagueness). Moreover, although there is no dispute that Scott Campbell was initially involved with the investigation into his brother's conduct, we find no evidence in the record that the Attorney General's office was improperly persuaded to act or that it pursued the investigation or prosecution in a discriminatory manner.

We conclude that the danger of arbitrary enforcement is speculative and insufficient to render the statute unconstitutionally vague as applied. *See Hoffman Estates,* 455 U.S. at 503, 102 S.Ct. at 1196.

## II.

 Respondent contends that language is ambiguous when it is subject to more than one reasonable interpretation, that ambiguous statutes must be strictly construed, and that, as required by the rule of lenity, we should narrowly construe Minn.Stat. § 609.2335, subd. 1(1) so as not to apply to his conduct. Respondent's contention is based, in large part, on his claim that the statute contains no clear mens rea requirement and creates a strict-liability crime.

 We recognize that "[t]he ambit of an ambiguous criminal law should be construed narrowly according to the rule of lenity." *State v. Zeimet,* 696 N.W.2d 791, 794 (Minn.2005). However, this court will not invoke principles of lenity when the statute at issue is not ambiguous. *State v. Loge,* 608 N.W.2d 152, 156 (Minn.2000). Consistent with our conclusion that the statute is drafted with sufficient definiteness to give defendants in respondent's alleged position fair warning of the conduct prohibited, we conclude that the language of the statute is not sufficiently ambiguous to invoke the rule of lenity.

Moreover, mens rea, is "[t]he state of mind that the prosecution [must prove] to secure a conviction.... [It refers to] criminal intent or recklessness ... also termed *mental element, criminal intent.*" *Black's Law Dictionary* 1006 (8th ed.

2004). Contrary to respondent's assertion that the statute contains no mens rea requirement, the statute requires an actor to "*intentionally* fail[ ] to use the financial resources of [a] vulnerable adult to provide" for the vulnerable adult's basic needs and care. Minn.Stat. § 609.2335, subd. 1(1) (emphasis added). Thus, the statute does not create a strict-liability crime and it requires the prosecution to prove beyond a reasonable doubt that the defendant acted intentionally.

We acknowledge that the statute is broadly worded, and some uncertainty will be inherent in many financial crimes. But because respondent failed to show that the statute is unduly vague as applied to respondent's conduct and because the statute includes a mens rea requirement, we conclude that a lenity analysis is unwarranted in this case.

## DECISION

Because criminalizing financial exploitation of a vulnerable adult, as provided by Minn.Stat. § 609.2335, subd. 1(1) (2002), is not unconstitutionally vague as applied to respondent's conduct and because the rule of lenity is not applicable in this case, we reverse the decision of the district court.

**Reversed.**