In re Petition for DISCIPLINARY AC-
TION AGAINST Donald W. FETT, a
Minnesota Attorney, Registration No.
29014.

No. A09–1862.

Supreme Court of Minnesota.

Nov. 24, 2010.

Martin A. Cole, Director, Timothy M. Burke, Senior Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, MN, for petitioner.

Donald W. Fett, Brooklyn Center, MN, pro se.

## OPINION

PER CURIAM.

On September 29, 2009, the Director of the Office of Lawyers Professional Responsibility filed a petition for disciplinary action against Donald Fett, an attorney duly licensed to practice law in Minnesota, alleging that Fett violated Minn. R. Prof. Conduct 1.1[1] and 1.4(b)[2] by advising a client to act in a manner contrary to the express terms of a Minnesota statutory short form power of attorney. After a hearing on the Director's allegations, the referee we appointed found that Fett had committed professional misconduct and recommended that Fett be publicly reprimanded and placed on unsupervised probation for a period of 1 year. Fett con-

---

1. Minnesota Rule of Professional Conduct 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

2. Minnesota Rule of Professional Conduct 1.4(b) provides: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

tests several of the referee's findings and conclusions of law and the referee's recommended discipline. We conclude that the referee did not err in his findings of fact and conclusions of law, and we publicly reprimand Fett and place him on unsupervised probation for a period of 1 year.

Donald Fett was admitted to practice in the State of Minnesota in 1977 and, since 2002, has practiced exclusively within the areas of estate planning and elder law.

The current disciplinary matter arose from Fett's advice to R.G. On July 9, 2008, R.G. met with Fett to discuss medical assistance planning for his brother, M.G. At the time, M.G. was 88 years old and suffered from dementia, depression, and blindness. M.G. was in a nursing home and was no longer competent to handle his own legal affairs. R.G. explained to Fett that he wanted M.G. to receive the care he needed, while protecting M.G.'s assets for distribution according to M.G.'s wishes, after M.G.'s death.

During the meeting on July 9, Fett learned that M.G. had assets of approximately $607,000, monthly expenses of approximately $6,600, and income from social security of $900 per month. R.G. and a third brother were authorized signatories on M.G.'s checking account.[3] With the exception of the checking account, all of M.G.'s assets were in forms that allowed for transfer at death.

In addition, Fett learned that R.G. was attorney-in-fact for M.G. under a Minnesota statutory short form power of attorney. See Minn.Stat. § 523.23 (2008). By a power of attorney, a principal grants certain powers to an attorney-in-fact. A statutory short form power of attorney lists 13 specific powers, such as the authority to enter

into real estate, banking, or gift transactions on the principal's behalf. Id., subd. 1. These powers are denominated (A) through (M) in the first part of the form. Id. Option (N) includes "all of the powers listed in (A) through (M) above and all other matters." Id. On the statutory short form, M.G. checked option (N), thereby giving R.G. broad authority to act for him. But in the third part of the statutory short form, principals must also state whether they will allow transfer of assets to the attorney-in-fact. Id. On his power of attorney form, M.G. made a check next to the statement "This power of attorney does not authorize the attorney-in-fact to transfer my property to the attorney-in-fact."

During the July 9 meeting, Fett provided R.G. with a retainer agreement. Several days later, R.G. signed and delivered the retainer agreement and a check for one-half of the retainer fee to Fett's office.

On July 17, 2008, Fett sent a letter to R.G. This letter stated that its purpose was to summarize the July 9 meeting and "to outline and review my recommendations." In the letter, Fett first summarized M.G.'s financial situation and R.G.'s goal, namely, "to protect some of the remaining inheritance your brother had hoped to leave to you, your siblings and charities." Fett explained that M.G. could not qualify for medical assistance if his assets totaled more than $3,000. See Minn.Stat. § 256B.056, subd. 3 (2008) (establishing eligibility requirements for medical assistance). Fett advised R.G. to transfer all but about $3,000 of his brother's assets out of the brother's ownership "as soon as possible." To accomplish this,

---

**3.** The record does not clearly indicate whether R.G. and the other brother were merely authorized signers or whether the account was a joint account with right of survivorship.

But Fett testified before the referee that the check by which R.G. paid half of the retainer fee was drawn on an account in M.G.'s name alone.

Fett advised that M.G.'s assets be liquidated and the proceeds deposited into M.G.'s checking account, on which R.G. was an authorized signer. Fett advised that R.G. "then write a check or checks to accomplish the gift in a total amount that will leave about $2800 in your brother's account."

Once M.G.'s assets had been reduced to $2,800, the July 17 letter advised R.G. to apply for medical assistance for M.G. "to trigger the penalty period." This is an apparent reference to Minn.Stat. § 256B.0595, subd. 2 (2008). Under section 256B.0595, an individual who makes uncompensated transfers of assets is ineligible for medical assistance for a period of time, the length of which is determined by dividing the uncompensated value of the assets transferred by the average per-person medical assistance rate for nursing facilities in the state in effect on the date of the application for medical assistance. The July 17 letter advised R.G. that if all of M.G.'s assets could be transferred out of M.G.'s name by the end of July, the "penalty period" would begin as of July 1. During the penalty period, Fett advised, R.G. should deposit funds into M.G.'s checking account as needed to pay for his care. Once the penalty period ran, Fett advised, R.G. should reapply for medical assistance for M.G., who "will then qualify for the benefit."

The letter advised R.G. to ultimately deposit M.G.'s funds into an account in which M.G. himself had no ownership interest, but in which funds would remain available to pay for M.G.'s care until he qualified for medical assistance. Fett acknowledged that the short form power of attorney executed by M.G. "does not allow you to transfer assets to yourself" and described "the ownership and control of the gifted portion" as "problematic." The July 17, letter nevertheless advised:

"From the standpoint of simplicity, it is easiest if you own it, invest it and continue to transfer funds into your brother's account to pay his expenses" and further advised that once M.G. qualified for medical assistance, "[t]he remainder of the gift to you will be yours to keep." The letter then lists "some problems with this approach," such as the fact that R.G. would have to pay taxes on income generated by the funds in the account and the possibility that M.G.'s other siblings "may be very suspicious of your ownership." But the letter does not explain how to reconcile Fett's recommendation that R.G. deposit his brother's assets into an account in R.G.'s name with the provision of the statutory short form power of attorney that barred R.G. from transferring M.G.'s assets to himself.

Fett also advised that because M.G.'s estate was less than $1 million, "there will be no gift or estate tax consequences." Fett indicated that R.G. would not have to report receipt of M.G.'s funds on R.G.'s income tax returns, but that any income generated by M.G.'s funds would be income to R.G. that would have to be reported on R.G.'s individual income tax returns.

Fett closed his July 17 letter by urging R.G. to keep Fett "up to date as matters progress," particularly "as you approach the end of the penalty period," which Fett indicated the parties would be "recalculating ... as circumstances dictate." Although the letter encouraged R.G. to call Fett with any questions or "to discuss any of these matters further," the July 17 letter does not indicate that any further meetings between the parties were scheduled.

Fett followed up his July 17 letter with another letter on July 22. With this second letter, Fett enclosed a document titled, "Medical Assistance Action Plan for [M.G.]" In this plan, Fett provided R.G.

with 18 steps to follow "as a guide throughout the [medical assistance] process." Step 1 of the plan was to liquidate all of M.G.'s financial assets and deposit them into M.G.'s checking account. Fett noted that "it would be preferable to simply transfer ownership to the gift recipient(s) where possible," but noted that "if you are to be the gift recipient, your power of attorney does not allow you to make a transfer directly to yourself." Step 4 called for M.G. to "make a gift of all but $2,800 from his checking account to gift recipient(s)." Step 9 called for R.G. to "[c]ontinue to pay for [M.G.'s] care as you have been" by withdrawing funds "from the gift account in the amount needed to pay expenses" and depositing them into M.G.'s account, from which M.G.'s expenses would then be paid.

On July 23, Fett had a telephone conversation with R.G. during which, the referee found, Fett encouraged R.G. to liquidate his brother's assets and deposit the proceeds into his brother's checking account to facilitate the anticipated transfers. On July 25, Fett and R.G. were scheduled to meet again to discuss the plan, but R.G. cancelled the appointment after consulting with another attorney. The disciplinary complaint to the Director followed.

In response to the complaint, the Director filed a petition for disciplinary action against Fett. The Director alleged that Fett committed misconduct in violation of Rule 1.1, which requires competent representation, and Rule 1.4(6), which provides that an attorney communicate with his client. Fett denied the Director's allegations of misconduct. We appointed a referee to hear the matter.

The referee found that the overall implication of Fett's July 17 letter to R.G. was a recommendation and that Fett intended for R.G. to act on it. The referee also found that Fett failed to provide R.G. with

enough information to make an informed decision whether to proceed with the recommended course of action in light of the power of attorney's provision that R.G. could not transfer M.G.'s assets to himself. The referee concluded that Fett's conduct violated Minn. R. Prof. Conduct 1.1 and 1.4(b). The referee also concluded that Fett's disciplinary history and experience in the practice of law with an emphasis in elder law were aggravating factors and that Fett's lack of an improper motive or harmful intent and the absence of direct harm to R.G. from Fett's actions were mitigating factors. As discipline, the referee recommended a public reprimand and unsupervised probation for a period of 1 year.

I.

■ We first address Fett's challenges to the referee's findings of fact. Because a party in this case ordered a transcript of the proceedings, we are not bound by the referee's findings. Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR); *see also In re Wentzell*, 656 N.W.2d 402, 405 (Minn.2003). Nonetheless, we will defer to the referee's findings, especially when the findings "rested on disputed testimony or in part on a respondent's demeanor, credibility, or sincerity," unless those findings are clearly erroneous. *In re Barta*, 461 N.W.2d 382, 382 (Minn.1990). For us to determine that the findings are clearly erroneous, "we must be left with the definite and firm conviction that a mistake has been made." *In re Waite*, 782 N.W.2d 820, 823 (Minn. 2010) (citation omitted) (internal quotation marks omitted). Finally, where "the referee's findings are supported by the evidence [and not clearly erroneous], they will be upheld." *In re Erickson*, 653 N.W.2d 184, 189 (Minn.2002).

Fett first argues that it was clearly erroneous for the referee to find that the July 17 letter was Fett's recommendation and that Fett intended for R.G. to rely on this letter. Fett contends that the July 9 meeting was only "for the purpose of gathering information," and he did not make any conclusions or recommendations during the meeting. Fett also argues that he did not intend the July 17 letter to be "the end of the discussion," only confirmation of the facts learned during the July 9 meeting and demonstration of the medical assistance process. The Director contends that the evidence supports the referee's findings regarding the July 17 letter.

The referee did not find that Fett actually *intended* the letter to be final. Rather, the referee found only that the overall *implication* of the letter was that it was Fett's final recommendation. There is evidence in the record to support the referee's finding. As Fett himself admitted during the referee hearing, the letter does not specifically state that it was only preliminary or that it represented only Fett's initial thoughts. Moreover, the July 17 letter recommends a course of action— transfer of all of M.G.'s assets by the end of July—that allowed little, if any, further consultation. The letter urges R.G. to keep Fett informed "as matters progress," particularly "as you approach the end of the penalty period." Because there is evidence in the record to support the finding,

we hold that the referee's finding is not clearly erroneous.

Second, Fett argues that R.G. could have liquidated M.G.'s assets under authority of the power of attorney and then, as an authorized signer on M.G.'s account under the Minnesota Multiparty Accounts Act, Minn.Stat. §§ 524.6–201 to 524.6–214 (2008), withdraw the funds from M.G.'s account.[4] Fett acknowledges in his brief to our court the possibility that the statutory short form power of attorney's bar against R.G. transferring M.G.'s assets to himself would limit R.G.'s actions as an authorized signer on his brother's checking account. Fett contends that he considered such a possibility but rejected it because, Fett concluded, the limitations in the statutory short form power of attorney could not limit R.G.'s authority to act on the basis of other sources of authority. Fett contends that the referee erred in finding otherwise.

The referee made no finding as to whether the Minnesota Multiparty Accounts Act allowed R.G. to transfer his brother's assets to himself, notwithstanding the terms of M.G.'s statutory short form power of attorney. Rather, the referee found that Fett failed to communicate his theory about the Minnesota Multiparty Accounts Act to R.G. and failed to provide R.G. with adequate information on which to make an informed decision whether to proceed in light of the restriction in the power of attorney. The July 17 letter

4. The Minnesota Multiparty Accounts Act governs the administration of multiparty accounts in Minnesota. Under the Act, a "multiple-party account" means that it is a joint account or a paid on death account. Minn. Stat. § 524.6–201, subd. 5. The depositor may create a survivorship account or a joint account using specific or similar language contained in the statute. Minn.Stat. § 524.6–213, subd. 1. If the depositor merely intends to create an account "for convenience only between a depositor and an agent" instead of a survivorship account, the depositor needs to use words that create a power of attorney. *Id.*, subd. 2. When this language is present, "the account shall be construed as a matter of law to be an account subject to a power of attorney with no survivorship rights." *Id.* The record does not reflect whether M.G.'s checking account was a survivorship account or joint account. Moreover, Fett does not explain whether or how the Act addresses self-dealing.

does not mention the Minnesota Multiparty Accounts Act, and there is no evidence in the record that Fett discussed the Act with R.G. during their July 9 meeting. We therefore hold that the referee's finding was not clearly erroneous.

Alternatively, Fett argues that because M.G. selected option (N) in the first part of the power of attorney, the power of attorney allowed R.G., as M.G.'s attorney-in-fact, to act as M.G.'s "alter ego" and therefore engage in powers beyond those listed in options (A) through (M), including the ability to transfer assets to himself. Fett contends that the referee erred in finding otherwise. Here again, the referee made no finding as to the scope of option (N) in the first part of the power of attorney.

Rather, the referee found that Fett failed to communicate to R.G. the basis for Fett's recommendation that R.G. transfer M.G.'s assets to himself, contrary to the express language of the third part of the power of attorney, and failed to provide R.G. with adequate information on which to make an informed decision whether to proceed, in light of the gifting restrictions in the power of attorney. The July 17 letter specifically states that the power of attorney "does not allow you to transfer assets to yourself" but does not explain on what legal basis R.G. could transfer M.G.'s assets into his own name. We therefore hold that the referee's finding that Fett failed to communicate was not clearly erroneous.[5]

## II.

■ In disciplinary proceedings, the Director must prove by clear and convincing evidence that the respondent committed professional misconduct. *In re Grigs-*

*by*, 764 N.W.2d 54, 60 (Minn.2009). The referee concluded that Fett's conduct violated Minn. R. Prof. Conduct 1.1 and 1.4(b). The referee also concluded that Fett's disciplinary history and experience in the practice of law with an emphasis on elder law were aggravating factors in determining the appropriate sanction. Fett contests these conclusions of law. We review the referee's application of the law to the facts for clear error. *In re Aitken*, 787 N.W.2d 152, 158 (Minn.2010).

### A.

■ First, Fett argues that the referee erred in concluding that he violated Minn. R. Prof. Conduct 1.1 and 1.4(b). The referee concluded that Fett violated Rules 1.1 and 1.4(b) based on the medical assistance planning advice Fett gave R.G. in the July 17 letter. We need not resolve in this case whether R.G. could, as a matter of law, transfer assets to himself, as Fett advised him to do in order to secure medical assistance for M.G. That question is not before us. We are called only to decide whether it was clearly erroneous for the referee to conclude that Fett violated Rules 1.1 and 1.4(b) when he advised R.G. to violate a specific prohibition in a legal document— here the power of attorney's prohibition on self-dealing—without explaining why such action was authorized and without explaining the possible consequences to the client if such action was not authorized. We conclude that the referee's conclusions are not clearly erroneous.

### 1.

Rule 1.1 of the Minnesota Rules of Professional Conduct provides: "A lawyer shall provide competent representation to

---

5. In finding number 25, the referee states that Fett contends that R.G. had the authority to self-deal because M.G. checked option (N) in the first part of the power of attorney form. Fett challenges this finding as clearly erroneous. Because the referee's finding is consistent with Fett's testimony, the finding is not clearly erroneous.

a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." We have previously concluded, on a number of occasions, that an attorney fails to provide competent representation when the attorney does not fully inform the client of the consequences of specific legal actions. *See In re Kaszynski,* 620 N.W.2d 708, 710–11 (Minn.2001) (concluding that lawyer violated Rule 1.1 by failing to explain the risks of filing certain papers with the Immigration and Naturalization Service); *In re Panel File 96–35,* 570 N.W.2d 499, 501–02 (Minn.1997) (concluding that lawyer violated Rule 1.1 by not advising her client of the consequences of failing to attend a hearing); *In re Logan,* 442 N.W.2d 312, 313 (Minn.1989) (concluding that lawyer violated Rule 1.1 by failing to advise his client that a marital termination agreement set child support below the level required by Minnesota law and therefore the agreement might be rejected by the district court).

In this case, Fett contends that R.G. could have transferred M.G.'s assets to himself either under option (N) of the power of attorney or (once M.G.'s investments were liquidated and the proceeds placed in M.G.'s checking account) because he was an authorized signer on M.G.'s checking account. But Fett acknowledges that no Minnesota case has interpreted the breadth of option (N) of the statutory short form power of attorney and no Minnesota case has held that the Multiparty Accounts Act overrides the terms of a statutory short form power of attorney.

If Fett's advice to R.G. had been challenged and found contrary to law, the consequences for R.G. could have been serious. For example, R.G. could have been held personally liable to his brother or his brother's estate for unauthorized transfers of assets, *see* Minn.Stat. § 523.21 (2008), and even for treble damages, *see* Minn. Stat. § 523.22 (2008). There is also at least one published opinion involving a criminal prosecution in which the defendant (who held a power of attorney that permitted self-gifting) was accused of violating Minn.Stat. § 609.2335 (2008) (financial exploitation of a vulnerable adult) by transferring his mother's assets from their joint checking account to himself. *See State v. Campbell,* 756 N.W.2d 263, 267 (Minn.App.2008), *rev. denied* (Minn. Dec. 23, 2008). In light of the lack of precedent for or against Fett's advice to R.G., and in light of the serious consequences to R.G. if Fett's advice proved wrong, it was not clearly erroneous for the referee to conclude that Fett violated Rule 1.1 because he did not advise R.G. of the possible consequences that could arise if R.G. followed Fett's recommended course of action.

2.

Rule 1.4(b) of the Minnesota Rules of Professional Conduct provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *See In re Panel Case No. 23236,* 728 N.W.2d 254, 258–60 (Minn. 2007) (concluding that a supervising attorney violated Minn. R. Prof. Conduct 1.4(b) when she failed to inform her client that the other attorney working on the client's case was on involuntary restricted status); *Panel File 96–35,* 570 N.W.2d at 502 (concluding that an attorney violated Minn. R. Prof. Conduct 1.4 when she failed to fully discuss the law with her client and the consequences for noncompliance with an order to show cause).

Given that Fett specifically advised R.G. in the July 17 letter to act contrary to the express provision of the power of attorney prohibiting self-dealing, Fett had an obli-

gation to provide R.G. with sufficient information so that R.G. could participate intelligently in the decision whether to transfer assets to himself, and an explanation of the means by which Fett believed self-gifting was possible, in light of the power of attorney's prohibition on self-dealing. *See* Minn. R. Prof. Conduct 1.4 cmt. 5 (2005); *see also Panel File 96–35,* 570 N.W.2d at 500. There is no evidence that Fett ever communicated these legal positions, or any uncertainty in the law as to these positions, to R.G. Based on this record, we hold that it was not clear error for the referee to conclude that Fett violated Minn. R. Prof. Conduct 1.4(b).

## B.

■ Second, Fett argues that the referee erred in concluding that his disciplinary history was an aggravating factor in determining the appropriate discipline. We have held on a number of occasions that an attorney's disciplinary history may be an aggravating factor in determining the appropriate discipline. *See In re Berg,* 741 N.W.2d 600, 605 (Minn.2007) ("[A]n attorney's prior disciplinary history can be considered as an aggravating factor while considering the cumulative weight of an attorney's misconduct."); *see also In re Holker,* 730 N.W.2d 768, 775 (Minn.2007); *In re Gherity,* 673 N.W.2d 474, 480 (Minn. 2004).

To date, the Director has admonished Fett five times and has entered into a stipulation for private probation with Fett. Fett received his first admonition in 1986 for failing to pursue a legal matter that had been entrusted to him and for failing to adequately inform his client of the case's status in violation of Minn. R. Prof. Conduct 1.3 [6] and 1.4. Fett received his second admonition in 1996 for violating Minn. R. Prof. Conduct 8.1(a)(3) (2005) [7] and Rule 25, Rules on Lawyers Professional Responsibility [8] when he failed to respond to requests for information by the Director related to a notice of an overdraft on his trust account. Fett received his third admonition in 1996 for violating Minn. R. Prof. Conduct 1.3 and 1.4 for failing to act with diligence, for failing to adequately inform his client of the case's status, and for violating Minn. R. Prof. Conduct 8.1(a)(3) and Rule 25, RLPR, when he failed to promptly respond to requests for information and documents from the district ethics committee and the Director. Fett received his fourth admonition in 2003 for violating Minn. R. Prof. Conduct 1.3 and 1.4 for failure to deposit the original copy of a client's will with the probate court as agreed and for failure to inform the client that the will was not deposited with the probate court. Fett received his fifth admonition in 2005 for violating Minn. R. Prof. Conduct 1.15(a)(2) and (f) [9] when he failed to deposit an ad-

---

**6.** Minnesota Rule of Professional Conduct 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

**7.** Minnesota Rule of Professional Conduct 8.1(a)(3) provides: "An applicant for admission to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not ... knowingly fail to respond to an admissions or discipline authority's lawfully authorized demand for information by either provid-

ing the information sought or making a good faith challenge to the demand."

**8.** Rule 25, RLPR, discusses the lawyer's duties and obligations to the Director in responding to the Director's reasonable requests for information when the lawyer is under investigation. The rule also provides grounds for discipline for noncompliance with requests for information.

**9.** Minnesota Rules of Professional Conduct 1.15(a) and (f) require attorneys to keep client

vance fee payment into his client trust account. Finally, Fett entered into a stipulation for private probation in 2000 for violating Minn. R. Prof. Conduct 8.4(b) [10] because he failed to timely file employer withholding returns and pay withholding taxes. The Director placed Fett on private probation for 2 years.

Consistent with our precedent on using an attorney's disciplinary history as an aggravating factor in determining an appropriate sanction and Fett's uncontested disciplinary history, we hold that it was not clear error for the referee to conclude that Fett's disciplinary history was an aggravating factor in determining the appropriate sanction.

## C.

■ Third, Fett argues that the referee erred in concluding that Fett's experience in the practice of law with an emphasis in elder law was an aggravating factor in determining the appropriate discipline. We have previously held that experience in the practice of law may be an aggravating factor in attorney discipline cases. *See In re Rebeau,* 787 N.W.2d 168, 176 (Minn. 2010) ("[S]ubstantial experience as a lawyer may constitute an aggravating factor."); *In re Lyons,* 780 N.W.2d 629, 636–37 (Minn.2010). Fett has been licensed to practice law since 1977. Fett does not dispute that since 2002, he has limited his practice to estate planning and elder law. We hold that it was not clear error for the referee to conclude that Fett's experience in the practice of law, and Fett's experience in the practice of elder law in particular, is an aggravating factor in determining the appropriate sanction.

## III.

■ We turn next to determine the appropriate discipline for Fett. The referee recommends that Fett be publicly reprimanded and placed on unsupervised probation for a period of 1 year. The Director urges that we adopt the referee's recommendation. Fett responds that he was acting within the "opinion and interpretation" of the law and in good faith, and that therefore no discipline is warranted.

■ The purpose of attorney discipline for violating the Rules of Professional Conduct "is not to punish the attorney, but rather to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys." *In re Waite,* 782 N.W.2d 820, 827 (Minn.2010). We give the referee's recommendation for discipline "great weight" in determining the appropriate form of discipline, but the "ultimate responsibility for sanctioning an attorney rests solely with this court." *In re Pinotti,* 585 N.W.2d 55, 62 (Minn.1998).

■ We consider four factors in determining the appropriate discipline to apply in attorney discipline cases. These factors are "(1) the nature of the misconduct, (2) the cumulative weight of the rule violations, (3) the harm to the public, and (4) the harm to the legal profession." *In re Muenchrath,* 588 N.W.2d 497, 500 (Minn.1999). In applying these factors, we "frequently look[ ] to cases involving similar misconduct to determine an appropriate sanction." *In re Monroe,* 659 N.W.2d 779, 781 (Minn.2003). We may also consider both aggravating and mitigating factors

---

funds received in the course of client representation in a separate client trust account.

**10.** Minnesota Rule of Professional Conduct 8.4(b) prohibits a lawyer from "commit[ting]

a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects."

when considering the appropriate sanction in attorney discipline cases. *Gherity*, 673 N.W.2d at 480.

*Nature of the misconduct.* The nature of the alleged misconduct in this case involves failure to explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

■■■■ *Cumulative weight of the rule violations.* We are inclined to impose "more severe sanctions when the current misconduct is similar to misconduct for which the attorney has already been disciplined." *In re Moore*, 692 N.W.2d 446, 450 (Minn.2005). A lawyer's prior disciplinary history is therefore relevant to determine the appropriate sanction for further professional misconduct. *See Gherity*, 673 N.W.2d at 480–81. As indicated, in 33 years of practice, Fett has previously been privately admonished five times and been subject to private probation. This is the first time Fett has been disciplined for violating Minn. R. Prof. Conduct 1.1, but he has been disciplined on three previous occasions for violating Minn. R. Prof. Conduct 1.4.

*Harm to the public and the legal profession.* Although Fett's actions did not cause direct harm to R.G., his actions did cause harm to the legal profession. Professional misconduct negatively affects the "administration of the law and the legal profession." *See In re Hawkins*, 502 N.W.2d 770, 771 (Minn.1993). To maintain society's confidence in the legal profession, individuals must be able to trust that their attorneys will act competently and communicate fully with them. *See In re Redburn*, 746 N.W.2d 330, 338 (Minn.2008) (concluding that an attorney's failure to communicate reflects adversely on the bar and decreases public confidence in the legal system).

*Aggravating and mitigating factors.* In determining the appropriate sanction to impose, we also consider aggravating and mitigating factors. *In re Geiger*, 621 N.W.2d 16, 22 (Minn.2001). The referee found Fett's prior disciplinary history and his experience in the practice of law with an emphasis in elder law to be aggravating factors. We agree with the referee that both Fett's disciplinary history and experience in the practice of law with an emphasis in elder law are important factors in determining the appropriate sanction.

Prior disciplinary history is an aggravating factor. *In re Holker*, 730 N.W.2d 768, 775 (Minn.2007) ("A lawyer's prior disciplinary history is relevant to determine an appropriate sanction."). Fett has previously been admonished five times and has entered into a stipulation for private probation with the Director. When an attorney has repeatedly violated the Rules of Professional Conduct, this demonstrates the attorney's lack of "commitment to comprehensive ethical and professional behavior." *In re Lyons*, 780 N.W.2d 629, 636 (Minn.2010) (citation omitted) (internal quotation marks omitted). We have previously concluded that "[t]he mere fact that [an attorney] has been disciplined six prior times [i.e., five private admonitions and a public reprimand] suggests that he has not renewed his commitment" to the standards of the legal profession. *Holker*, 730 N.W.2d at 775 (internal quotation mark omitted). Given that Fett has previously received five private admonitions and has entered into a stipulation for private probation, Fett has not renewed his commitment to abiding by the Rules of Professional Conduct.

■■■ Substantial practice in the law is also an aggravating factor because it is assumed that an experienced attorney has had an opportunity to become familiar with the law. *See Lyons*, 780 N.W.2d at 636–

37; *In re Moeller,* 582 N.W.2d 554, 559–60 (Minn.1998). Fett was admitted to practice law in 1977, and consequently he has practiced law for many years. Further, in addition to years of practice, we have also considered the attorney's experience in a particular area of the law to be an aggravating factor when the misconduct arises from that area of practice. *See Holker,* 730 N.W.2d at 775 (concluding that lawyer's experience in estate planning constituted an aggravating factor). Fett has practiced exclusively in the areas of estate planning and elder law since 2002.

 With respect to mitigation, the referee found the lack of harm to R.G. resulting from Fett's actions and the lack of an improper motive or harmful intent when Fett acted to be mitigating factors. Lack of harm to the client can be a mitigating factor when determining the appropriate sanction for attorney misconduct. *In re Ray,* 452 N.W.2d 689, 694 (Minn. 1990); *see also In re Farley,* 771 N.W.2d 857, 863 (Minn.2009). We have also considered the lack of improper motive or harmful intent as a mitigating factor. *See In re Rooney,* 709 N.W.2d 263, 265 (Minn. 2006); *In re Bernard,* 534 N.W.2d 272, 275 (Minn.1995) ("[T]he court has considered a lack of intent to harm the client or to profit from the conduct as mitigating factors...."). But given the nature and cumulative effect of the misconduct and Fett's experience and disciplinary history, the mitigating factors do not support a conclusion that we should depart from the referee's recommended discipline.

Based upon the record before us, we order that respondent Donald W. Fett is publicly reprimanded and placed on probation for a period of 1 year, subject to the following terms and conditions:

1. Respondent shall cooperate fully with the Director's Office in its efforts to monitor compliance with this probation.

Respondent shall promptly respond to the Director's correspondence by its due date. Respondent shall provide the Director with a current mailing address and shall promptly notify the Director of any change of address. Respondent shall cooperate with the Director's investigation of any allegations of professional misconduct that may come to the Director's attention. Upon the Director's request, respondent shall provide authorization for release of information and documentation to verify compliance with the terms of his probation.

2. Respondent shall abide by the Minnesota Rules of Professional Conduct.

Respondent shall pay $900 in costs pursuant to Rule 24, RLPR.

So ordered.